**Alicia A. HILL, Plaintiff,**

v.

**METROPOLITAN ATLANTA RAPID TRANSIT AUTHORITY,**
**Defendant.**

**No. Civ.A. 1:98–CV–389–TW.**

United States District Court,
N.D. Georgia,
Atlanta Division.

May 13, 1999.

---

Frederick C. McLam, Decatur, GA, for Plaintiff.

Robert Jon Routman, Metropolitan Atlanta Rapid Transit Authority, Atlanta, GA, for Defendant.

## ORDER

THRASH, District Judge.

This is an employment discrimination case seeking damages pursuant to the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.* It is before the Court on the Defendant's Motion for Summary Judgment [Doc. 11]. For the reasons set forth below, the motion should be granted.

### I.  BACKGROUND

In 1985, Plaintiff Alicia Hill began her employment with Defendant Metropolitan Atlanta Rapid Transit Authority ("MARTA"). She worked in the Contract Control section, a division of the Office of Contracts and Procurements. Only three people worked in the office of Contract Control: (1) the Plaintiff; (2) co-worker Donna Morgan; and (3) supervisor Joann Headrick, and later Neil Poling. The Contract Control office is self contained and separate from other divisions of the Office of Contracts and Procurements. From a hallway, there is both a window and a doorway opening into the office of Contract Control. The window is used to receive bids from outside vendors, to meet with vendors and to meet with MARTA personnel. Members of the public are normally limited to coming to the window to review public contracts. The window was open from 8:00 a.m. to 5:00 p.m. It was the Plaintiff's duty to staff the Contract Control window. She had to staff the window whenever Morgan took lunch. The Plaintiff and Morgan alternated their lunch hours so that one person would be able to cover the window. The Plaintiff staffed the Contract Control window whenever Morgan would go on vacation or was otherwise out. The Plaintiff also pulled contracts for MARTA Contract Agents

who needed to review the particular contract and related correspondence.

The Plaintiff's first supervisor was Headrick, who was the Plaintiff's supervisor until August, 1995. Headrick was difficult to everyone, including the Plaintiff. The morale of the employees suffered under Headrick. By 1991, Plaintiff began having symptoms of depression. Much of her stress and depression originated from working under Headrick. The Plaintiff started treating her depression in 1995, while still working for Headrick. The Plaintiff first sought counseling with MARTA's Employee Assistance Program Counselor. The Plaintiff was then referred to a therapist, Sue Daniels, and later to a psychiatrist, Dr. Kennedy. After Headrick retired, Poling became the new supervisor. Poling confirmed that Headrick's managerial style was strict and controlling and that morale was low as a result. While still working full-time at MARTA, the Plaintiff went to DeKalb College at night from 1994 through 1996. Poling delayed the Plaintiff's start time from 8:00 a.m. to 8:30 a.m. to accommodate her problem getting to work on time while she was going to school at night.

In January, 1996, the Plaintiff was hospitalized at Brawner Hospital for depression. The Plaintiff then returned to work on February 12, 1996. In her written statement concerning the circumstances of her discharge, the Plaintiff indicated that she was depressed "due to a number of reasons including work environment." (Plaintiff's Dep., Exh. 1). After returning from her medical leave for depression, the Plaintiff learned that Morgan had resentment toward her. The Plaintiff testified that this made her work environment very cold as she felt "the vibes of [Morgan] being upset so it was very stressful working in the office." (Plaintiff's Dep. at 40–41). The Plaintiff then had a setback in her depression as she began to feel "kind of trapped or sort of like helpless or hopeless." (*Id.* at 48). The Plaintiff first sought treatment for sleep apnea in June, 1996. She began treatment under the care of Dr. Alan Lankford of the Sleep Disor-

der Center of Georgia. Dr. Lankford explained her medical condition to MARTA through three letters dated June 30, 1996; August 27, 1996; and February 10, 1997. (Plaintiff's Dep., Exhs. 2–4).

In October, 1996, the Plaintiff began a three-month nursing program in the evening school of DeKalb Tech. She completed the program in December, 1996. After earning her nursing degree, the Plaintiff accepted a job with Georgia Baptist Hospital in February, 1997, while simultaneously working for MARTA. At Georgia Baptist Hospital, the Plaintiff worked a 12–hour shift from 7:00 p.m. until 7:00 a.m. three nights a week. The Plaintiff mostly worked these night shifts on Friday, Saturday and Sunday nights.

The Plaintiff testified that she thought she was performing her job satisfactorily, that she received good reviews for doing her job from both Headrick and Poling, and that she was meeting the expectations of doing her job. (Plaintiff's Dep. at 53–54). The only negatives in any performance review were write-ups from Headrick and Poling for tardiness. (*Id.* at 54, Exhs. 5–6). On December 12, 1996, the Plaintiff received a Final Warning of Suspension and Termination of Employment memorandum from Poling due to her tardiness. (Plaintiff's Dep., Exh. 7). In that memorandum, Poling stated that the Plaintiff had arrived late at work virtually on a daily basis and that her tardiness had caused undue stress on co-workers. (*Id.*). Poling stated that her official work starting time is 9:00 a.m., that the next occurrence of tardiness or absenteeism will result in a three-day suspension without pay, and that any subsequent occurrence of tardiness or absenteeism will result in termination of employment. (*Id.*). Poling warned the Plaintiff that tardiness may not be made up by lunch or overtime. (*Id.*). The Plaintiff was placed on probation.

By letter dated December 20, 1996, the Plaintiff stated that her tardiness was due to her battles with depression and

sleep apnea. (Plaintiff's Dep., Exh. 8). By memorandum dated January 7, 1997, Poling suspended the Plaintiff for three days without pay for failing to report to work in accordance with the probation pursuant to the December 12, 1996, memorandum. (Plaintiff's Dep., Exh. 9). By memorandum dated January 9, 1997, Poling clarified the conditions for the Plaintiff's continued employment with MARTA. (Plaintiff's Dep., Exh. 10). He stated that all instances of the Plaintiff's tardiness must end immediately and that any absences within 60 days of January 9, 1997, will subject her to immediate termination. (*Id.*). The Plaintiff successfully completed the 60–day probationary period with no violations.

In March, 1997, the Plaintiff turned in a time sheet which was challenged by Poling to reflect that she was tardy. The Plaintiff explained that she took a vacation day and that she made up the tardiness by working through lunch and overtime. (Plaintiff's Dep. at 76–80, Exhs. 11–12). On Friday, April 4, 1997, the Plaintiff was involved in an automobile accident on the way home from work. She finished driving home and sought no medical treatment that weekend. On Monday, April 7, 1997, the Plaintiff went to a doctor and received an excuse from work for Monday and Tuesday of that week. She returned to work on Wednesday, April 9, 1997. The next day, the Plaintiff met with an insurance adjuster concerning the damage to her automobile and failed to come into work until 11:45 a.m. Poling asked her if there was a medical reason to excuse arriving late. The Plaintiff informed Poling that there was no medical reason and that she was late due to her meeting with the insurance adjuster. On April 15, 1997, the Plaintiff's employment with MARTA was terminated for unexcused tardiness, the latest occurring on Thursday, April 10, 1997. (Doc. 11, Exh. 22, Poling Aff. at ¶ 16; Doc. 16, Exh. 1).

During her employment with MARTA, the Plaintiff requested that her working hours be changed to a later time to accommodate her tardiness. (Plaintiff's Dep. at 89–90). By letter dated January 14, 1997, the Plaintiff's counsel requested that Poling make reasonable accommodations to account for her disabilities of depression and sleep apnea. (Doc. 11, Exh. 17). The Plaintiff's counsel requested that her start time be adjusted to 10:00 a.m. and end time be adjusted to 6:00 p.m. (*Id.*). In a letter dated March 26, 1997, counsel requested an alternative accommodation of a 9:30 a.m. start time. (Doc. 11, Exh. 21). The Plaintiff was never granted these requested accommodations. Poling recalls moving the Plaintiff's start time from 8:30 a.m. to 8:45 a.m. in June, 1996. (Doc. 11, Exh. 22, Poling Aff. at 7). He recalls moving her start time to 9:00 a.m. in November, 1996. The Plaintiff made no other reasonable accommodation request. She testified that no doctor ever told her that it was necessary for her to delay her report to work time in order to perform her job. (Plaintiff's Dep. at 90). She could not explain how a delayed report time would affect her ability to perform her job. (*Id.*).

After the Equal Employment Opportunity Commission ("EEOC") issued Notice of a Right to Sue MARTA, the Plaintiff filed the present ADA Complaint on February 11, 1998. In addition to monetary relief, the Plaintiff seeks a judgment declaring that MARTA's actions constitute unlawful employment practices in violation of the ADA. Subsequently, MARTA filed a Motion for Summary Judgment [Doc. 11]. MARTA contends that the Plaintiff (1) has failed to establish an ADA disability; (2) is not a qualified individual under the ADA; (3) was not terminated based on discrimination; and (4) was granted reasonable accommodations. MARTA further contends that the Plaintiff's absences were an undue hardship on the company. The Plaintiff responds that significant circumstantial and direct evidence exist to show that the Plaintiff has a disability, is a qualified individual, and was subjected to unlawful discrimination because of her disability.

## II. SUMMARY JUDGMENT STANDARDS

Summary judgment is appropriate only when the pleadings, depositions, and affidavits submitted by the parties show that no genuine issue of material fact exists and that the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The court should view the evidence and any inferences that may be drawn in the light most favorable to the non movant. *Adickes v. S.H. Kress and Co.*, 398 U.S. 144, 158–159, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). The party seeking summary judgment must first identify grounds that show the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). The burden then shifts to the non-movant, who must go beyond the pleadings and present affirmative evidence to show that a genuine issue of material fact exists. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986).

At the summary judgment stage, the court's function is not to weigh the evidence to determine the truth of the matter, but to determine whether a genuine issue of material fact exists for trial. *Anderson*, 477 U.S. at 249, 106 S.Ct. at 2510. "If a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, then the court should not grant summary judgment." *Jeffery v. Sarasota White Sox, Inc.*, 64 F.3d 590, 593 (11th Cir.1995). "Where the record taken as a whole could not lead a rationale trier of fact to find for the nonmoving party," summary judgment for the moving party is proper. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

## III. DISCUSSION

The ADA provides that no covered employer shall discriminate against "a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). To establish a *prima facie* case of discrimination under the ADA, "a plaintiff must demonstrate that (1)[s]he has a disability; (2)[s]he is a qualified individual; and (3)[s]he was subjected to unlawful discrimination as the result of [her] disability." *Gordon v. E.L. Hamm & Assocs., Inc.*, 100 F.3d 907, 910 (11th Cir. 1996), *cert. denied*, 522 U.S. 1030, 118 S.Ct. 630, 139 L.Ed.2d 610 (1997). A plaintiff must demonstrate that the employer had either actual or constructive knowledge of the disability or considered the employee to be disabled. *Gordon* 100 F.3d at 910–11. The ADA imposes on employers the duty to provide reasonable accommodation for known disabilities unless doing so would result in undue hardship to the employer. 42 U.S.C. § 12112(b)(5)(A); *see also Holbrook v. City of Alpharetta*, 112 F.3d 1522, 1526 (11th Cir.1997). A "qualified individual with a disability" is an "individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8).

In this case, the Plaintiff cannot establish a *prima facie* case of ADA discrimination because she has failed to show that she has a disability. Under the ADA, an individual is considered to have a disability if she (1) has a physical or mental impairment that substantially limits one or more of the major life activities of an individual; (2) has a record of such impairment; or (3) is regarded as having such an impairment. 42 U.S.C. § 12101(2). To constitute a disability under the ADA, the impairment, whether mental or physical, must substantially limit a major life activity. *Gordon*, 100 F.3d at 911; *Pritchard v. The Southern Company*, 92 F.3d 1130, 1132 (11th Cir.1996). Thus, the mere existence of an impairment is not sufficient to

prove ADA disability. *See Standard v. A.B.E.L. Services, Inc.,* 161 F.3d 1318, 1327 (11th Cir.1998); *Pritchard,* 92 F.3d at 1132–33.

The ADA defines neither "major life activities" nor "substantially limits," and courts may rely on regulations promulgated by the EEOC with regard to the ADA and the Rehabilitation Act. *Gordon,* 100 F.3d at 911. "Major life activities" include basic functions and activities such as walking, seeing, hearing, breathing, learning, sitting and working. 29 C.F.R. § 1630.2(i). When determining whether an impairment substantially limits a major life activity, courts should consider (1) the nature and severity of the impairment; (2) the duration or expected duration of the impairment; and (3) the permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment. 29 C.F.R. § 1630.2(j)(2). "To demonstrate that an impairment 'substantially limits' the major life activity of working, an individual must show '[significant restrictions] in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills, and abilities.'" *Gordon,* 100 F.3d at 912 (quoting 29 C.F.R. § 1630.2(j)(3)(i)). "[T]he 'inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working.'" *Id.*

In this case, the Plaintiff has not established that her impairments, depression and sleep apnea substantially limited any of her major life activities, including working. She argues in a conclusory fashion that the impairments cause her to be late getting to work. However, she has failed to demonstrate how her impairments significantly restricted her ability to perform any aspect of her job. No medical evidence was presented showing any kind of a link between her impairments and tardiness. In his correspondence to MARTA regarding the Plaintiff's sleep apnea problem, Dr. Lankford stated that her daytime alertness would improve considerably under his treatment. (Plaintiff's Dep., Exhs. 2–3). In his last letter dated February 10, 1997, Dr. Lankford advised MARTA that her obstructive sleep apnea was essentially eliminated through treatment. (Plaintiff's Dep., Exh. 4). Dr. Lankford never advised MARTA that the Plaintiff's starting time should be delayed due to her condition or that tardiness was a symptom of her condition. Sharon Terry, an administrator in MARTA's Department of Human Resources, stated that (1) none of the Plaintiffs medical providers ever expressed any opinion to MARTA that it was necessary to excuse her from reporting to work on time; and (2) all of MARTA's physicians provided no medical reason why the Plaintiff could not report to work on time. (Doc. 11, Exh. 24, Terry Aff. at ¶¶ 4–6). Even the Plaintiff testified that no doctor ever told her that it was necessary for her to delay her report to work time in order to perform her job. (Plaintiff's Dep. at 90). Plaintiff was finally fired for being late because of a meeting with an insurance adjuster not because of depression or sleep apnea.

The record reflects no substantial limitation in the Plaintiff's ability to perform her job at MARTA. The Plaintiff testified that she received good reviews for doing her job from both her supervisors, Headrick and Poling, and that she was meeting the expectations of doing her job. (Plaintiff's Dep. at 53–54). Her performance evaluations from 1991 onward indicated that she met or exceeded expectations on performance standards. (Plaintiff's Dep., Exh. 5). During the time she was struggling with her tardiness, the Plaintiff attended night school from 1994–1996. She also moonlighted as a nursing assistant beginning in February, 1997, and worked 12 hour shifts three nights a week. Her abilities to maintain this type of rigorous schedule indicate that the Plaintiff was not substantially limited in any major life activity, especially her ability to perform her duties at MARTA.

Based on the undisputed evidence in the record, the Court finds that no reasonable juror could conclude that the Plaintiff has an impairment that substantially limited her ability to care for herself or to work during her time at MARTA. The Plaintiff neither alleges nor contends that MARTA regarded her as having a disability. The Plaintiff has failed to establish the first part of her *prima facie* of ADA disability. Accordingly, the Defendant is entitled to summary judgment because the Plaintiff cannot establish that she is disabled pursuant to the ADA. It is therefore unnecessary to consider the other two requirements of the Plaintiff's *prima facie* case, whether she is a qualified individual and whether she was subjected to unlawful discrimination as the result of her claimed disability.

### IV. CONCLUSION

For the foregoing reasons, MARTA's Motion for Summary Judgment [Doc. 11] is GRANTED. The Clerk is directed to enter final judgment in favor of Defendant MARTA and against the Plaintiff.