**Daryl S. COUTS, Plaintiff,**

v.

**BEAULIEU GROUP, LLC, Defendant.**

No.  02–CV–204.

United States District Court,
N.D. Georgia,
Rome Division.

Oct. 17, 2003.

C. Chad Young, Office of Clifton M. Patty, Jr., Ringgold, GA, for Daryl S. Couts, plaintiff.

Kelly D. Ludwick, Donna L. Keeton, Hunton & Williams, Peter Norbert Farley, Seyfarth Shaw, Atlanta, GA, for Beaulieu Group, LLC, defendant.

## ORDER

MURPHY, District Judge.

This is an employment discrimination case, in which Plaintiff alleges that Defendant terminated Plaintiff's employment on the basis of his disability, in violation of the Americans with Disabilities Act ("ADA"). The case is before the Court on Defendant's Motion for Summary Judgment [21].

## I. Background

Keeping in mind that when deciding a motion for summary judgment, the Court "must view the evidence and all factual inferences in the light most favorable to the party opposing the motion," the Court provides the following statement of facts. *Reynolds v. Bridgestone/Firestone, Inc.*, 989 F.2d 465, 469 (11th Cir.1993). This statement does not represent actual findings of fact; rather, it is intended simply to place the Court's legal analysis within the context of a specific case or controversy. *Swint v. City of Wadley*, 51 F.3d 988, 992 (11th Cir.1995) ("[W]hat we state as 'facts' in this [order] for purposes of reviewing the ruling[ ] on the summary judgment motion[ ] may not be the actual facts. They are, however, the facts for present purposes, and we set them out below.").

### A. Factual Background

#### 1. The Parties

Plaintiff resides in Dalton, Georgia. (Aff. of Connie J. Couts ¶ 2; Aff. of Daryl S. Couts ¶ 3; Dep. of Connie J. Couts at 27; Dep. of Daryl S. Couts at 53.) During the time period relevant to this action,

Plaintiff was employed by Defendant. (D. Couts Aff. ¶ 9; D. Couts Dep. at 79–80.)

Defendant is a privately-owned company that is engaged in the process of manufacturing fiber, carpet backing, and carpet. (Decl. of Bernadette Martin ¶ 3.) Prior to March 2002, Defendant owned a rug division that included a rug manufacturing facility located in Dalton, Georgia (the "Bandy Plant"). (*Id.* ¶ 4.)

### 2. Plaintiff's Heart Condition

In August 1999, Plaintiff suffered from an episode or condition that Plaintiff calls "rapid heartbeat." (D. Couts Aff. ¶ 4; D. Couts Dep. at 87.) During this episode, Plaintiff's heart began beating rapidly. (D. Couts Aff. ¶ 5.) As a result of the episode, Plaintiff became incapacitated and was hospitalized until his heart rate stabilized. (*Id.*) During the episode, Plaintiff suffered severe pain. (*Id.* ¶ 6.) For approximately two days after his release from the hospital, Plaintiff continued to experience residual pain in his left arm, neck, and jaw. (*Id.*) Plaintiff's treating physicians diagnosed Plaintiff's condition as "acute supraventricular re-entrant tachycardia" ("rapid heartbeat condition"). (*Id.* ¶ 7.)

Plaintiff takes medication for his rapid heartbeat condition. (D. Couts Aff. ¶ 8; D. Couts Dep. at 88.) The medication ordinarily controls Plaintiff's rapid heartbeat condition. (D. Couts Aff. ¶ 8; C. Couts Dep. at 141; D. Couts Dep. at 88, 188–89, 197.)

From August 1999 to September 2003, Plaintiff suffered five or six rapid heartbeat episodes. (D. Couts Aff. ¶ 8; D. Couts Dep. at 190.) Each episode was similar to the August 1999 episode. (D. Couts Aff. ¶ 8; D. Couts Dep. at 190–91.) Each episode required hospitalization for a brief period. (D. Couts Aff. ¶ 8; D. Couts Dep. at 190–91.) The episodes, however, generally lasted a "day or two," and did not cause Plaintiff to become incapacitated for long periods of time. (C. Couts Dep. at 78; D. Couts Dep. at 190–91.)

Plaintiff can participate in household chores. (C. Couts Dep. at 51; D. Couts Dep. at 199.) Specifically, Plaintiff can clean up after himself, prepare meals, clean dishes, and shop for groceries. (C. Couts Dep. at 51.) Plaintiff's rapid heartbeat condition does not limit Plaintiff's ability to engage in daily activities, such as standing up, walking, bending over, picking up objects, showering, shaving, grooming himself or caring for himself, seeing, reading, hearing, understanding, or communicating. (D. Couts Dep. at 199.) At his deposition, Plaintiff stated that there was nothing that Plaintiff's rapid heartbeat condition prevented Plaintiff from doing. (*Id.* at 200.)

Plaintiff could perform all the requirements of his job with Defendant. (D. Couts Dep. at 88.) Plaintiff testified at his deposition that his rapid heartbeat condition did not prevent him from performing his job duties for Defendant, and that the condition did not limit his ability to perform his job duties. (*Id.* at 165, 199.) Plaintiff never requested that Defendant provide Plaintiff with any accommodations to assist Plaintiff in performing his job. (*Id.* at 282.)

### 3. Plaintiff's Employment with Defendant

In approximately December 1999, Plaintiff began working for Defendant through a temporary employment service. (D. Couts Aff. ¶ 9; D. Couts Dep. at 89.) On February 16, 2000, Defendant hired Plaintiff as a permanent employee. (D. Couts Aff. ¶ 9; D. Couts Dep. at 97.)

In connection with his employment with Defendant, Plaintiff completed a Medical History Form. (D. Couts Aff ¶ 10 & Ex. A; D. Couts Dep. at 196.) On that form,

Plaintiff indicated that he had a "rapid heartbeat at one time," but that the condition was under control. (D. Couts Aff. ¶ 10 & Ex. A; D. Couts Dep. at 196.)

Defendant initially employed Plaintiff as a stocker. (D. Couts Aff. ¶ 12; D. Couts Dep. at 98, 129, 148–49.) Plaintiff's duties included operating a hyster, or "cherry picker," and removing rugs from Defendant's finishing department and placing the rugs in the appropriate storage bins in Defendant's warehouse. (D. Couts Aff. ¶ 12.) Plaintiff's duties as a stocker required Plaintiff to walk, bend over, pick up items, and lift between 50 and 100 pounds. (*Id.* ¶ 13.)

In April 2001, Defendant employed Plaintiff as a supply room clerk. (D. Couts Aff. ¶ 14; D. Couts Dep. at 147, 152.) After approximately one month, Defendant transferred Plaintiff back to the stocker position under Defendant's seniority system when a more senior employee lost his position and became eligible for the supply room clerk position. (D. Couts Aff. ¶ 14; D. Couts Dep. at 153, 155–57.)

Plaintiff maintains that he performed his job adequately. (D. Couts Aff. ¶ 20.) Plaintiff asserts that none of Defendant's managers or supervisors complained about Plaintiff's job performance. (D. Couts Aff. ¶ 20; Dep. of Terry Butler at 13–14.) According to Plaintiff, Plaintiff received no discipline, reprimands, counseling, verbal warnings, or written warnings, and was not accused of violating any of Defendant's rules or policies. (D. Couts Aff. ¶ 21.)

### 4. The Events of August 21, 2001

On August 21, 2001, Plaintiff worked for Defendant as a stocker and forklift operator in Defendant's shipping department. (D. Couts Aff. ¶ 22.) Plaintiff worked the 7:00 p.m. to 7:00 a.m. shift at the Bandy Plant. (*Id.* ¶ 22.)

On August 21, 2001, Plaintiff stopped at the Eckerd Pharmacy in Dalton, Georgia,

on his way to work. (D. Couts Aff. ¶ 33.) At the pharmacy, Plaintiff experienced a rapid heartbeat episode. (C. Couts Aff. ¶ 3; D. Couts Aff. ¶ 23; c. Couts Dep. at 60–61; D. Couts Dep. at 230.)

An ambulance transported Plaintiff to the Hamilton Medical Center. (C. Couts Aff. ¶ 3; D. Couts Aff. ¶ 24; C. Couts Dep. at 61; D. Couts Dep. at 230–31.) Plaintiff was admitted to the Hamilton Medical Center. (D. Couts Aff. ¶ 24.) Prior to the August 21, 2001, episode, Plaintiff had not experienced an episode of his rapid heartbeat condition since before beginning his employment with Defendant. (*Id.* ¶ 19.)

Plaintiff's spouse, Connie Couts, attempted to telephone Plaintiff's supervisor, Terry Butler, to inform Mr. Butler that Plaintiff could not report to work on August 21, 2001. (C. Couts Dep. at 65–66.) Mrs. Couts, however, was unsuccessful in contacting Mr. Butler by telephone. (*Id.* at 65–66.)

Mrs. Couts eventually drove to the Bandy Plant and asked the guard to get Mr. Butler. (C. Couts Aff. ¶ 5; D. Couts Aff. ¶ 25; C. Couts Dep. at 66, 71, 77.) Mr. Butler met with Mrs. Couts. (C. Couts Aff. ¶ 6; D. Couts Aff. ¶ 25; C. Couts Dep. at 77.)

Mrs. Couts explained to Mr. Butler that Plaintiff had experienced a rapid heartbeat episode or arrhythmia, and that Plaintiff was at the Hamilton Medical Center. (C. Couts Aff. ¶ 6; C. Couts Dep. at 77.) Mrs. Couts indicated that Plaintiff would be absent from work until his release from the hospital. (C. Couts Aff. ¶ 6; C. Couts Dep. at 77.) Mr. Butler stated that he understood, and that he had heart problems himself. (C. Couts Aff. ¶ 7; C. Couts Dep. at 77.) Mr. Butler told Mrs. Couts to tell Plaintiff not to worry about his absence. (C. Couts Aff. ¶ 7; C. Couts Dep. at 77.) Mrs. Couts did not provide Mr. Butler with additional details concerning

Plaintiff's condition. (C. Couts Dep. at 78.)

On August 22, 2001, Plaintiff was discharged from Hamilton Medical Center. (D. Couts Aff. ¶ 28; D. Couts Dep. at 231.) The hospital personnel provided Plaintiff with a discharge summary, and the discharge nurse informed Plaintiff that the summary should be sufficient to allow Plaintiff to return to work. (D. Couts Aff. ¶ 28.)

### 5. The Events of August 23, 2001

On August 23, 2001, Plaintiff took his discharge summary to Defendant's nurses station. (D. Couts Aff. ¶ 30; Dep. of Leta Newman at 22; D. Couts Dep. at 236.) Plaintiff sought a return to work release form. (D. Couts Aff. ¶ 30.) Plaintiff believed that he could return to work with no restrictions. (*Id.*)

According to Plaintiff, the receptionist at the nurses station reviewed Plaintiff's discharge summary and stated, " 'I see that you have a heart condition.' " (D. Couts Aff. ¶ 33.) When Plaintiff responded affirmatively, the receptionist stated, " 'That's not good, are you going to be o.k.?' " (*Id.*) Plaintiff indicated that he would be okay, and waited for a nurse to meet with him. (*Id.*)

Leta Newman, a nurse employed by Defendant, called Plaintiff to the waiting room window and informed Plaintiff that Plaintiff had to obtain a return to work slip from his treating physician. (D. Couts Aff. ¶ 34; Newman Dep. at 22–23; D. Couts Dep. at 241–42.) According to Plaintiff, Plaintiff responded that the discharge nurse had provided him with the discharge summary. (D. Couts Aff. ¶ 34.) Nurse Newman insisted that she needed more information from Plaintiff's treating physician. (*Id.* ¶ 35.) Plaintiff asked if Nurse Newman could call Plaintiff's physician's office and ask the physician to fax the needed information to Nurse Newman.

(D. Couts Dep. at 242; D. Couts Aff. ¶ 35.) Nurse Newman informed Plaintiff that Plaintiff was required to obtain the necessary information himself, and to deliver the information personally to Nurse Newman before Plaintiff could obtain a return to work release. (D. Couts Aff. ¶ 35; D. Couts Dep. at 242.)

Plaintiff claims that he "did not argue with, assault, yell at, become loud or angry toward, intimidate or act hostile or disrespectful to Nurse Newman." (D. Couts Aff. ¶ 36; D. Couts Dep. at 244, 274, 276–78.) Plaintiff also contends that he "did not throw any object at or toward Nurse Newman." (D. Couts Aff. ¶ 36; D. Couts Dep. at 278.) Additionally, Plaintiff denies becoming upset or agitated. (D. Couts Dep. at 242–44.)

Nurse Newman, however, claims that Plaintiff informed Nurse Newman that Plaintiff was on his own time, not Defendant's time, and that Plaintiff did not have to get Nurse Newman anything else. (Newman Dep. at 23.) According to Nurse Newman, Plaintiff was angry and spoke loudly. (*Id.* at 23–24.) Nurse Newman insisted that she needed more information from Plaintiff's physician. (*Id.* at 25.) Nurse Newman recalls that Plaintiff took the return to work form and threw it down in Nurse Newman's direction. (*Id.* at 26.) Nurse Newman felt uncomfortable. (*Id.* at 28.)

On August 23, 2001, Nurse Newman reported to Judith Walker, Defendant's Nurse Supervisor, that Plaintiff had come to the nurse's station requesting a return-to-work release, and that Nurse Newman had informed Plaintiff that Defendant's policy required Plaintiff to provide more specific information concerning Plaintiff's ability to return to work and work restrictions before Nurse Newman could provide Plaintiff with the return to work release. (Decl. of Judith Walker ¶ 5; Newman Dep.

at 28; Dep. of Judith Walker at 27.) Nurse Newman reported that Plaintiff began yelling at Nurse Newman, that Plaintiff said he did not have to get Nurse Newman any additional information, and that Plaintiff acted in a hostile and threatening manner toward Nurse Newman. (Walker Decl. ¶ 5; Walker Dep. at 27–29, 31.) Nurse Newman was very upset, and Nurse Walker became upset. (Walker Decl. ¶¶ 5–6; Newman Dep. at 28; Walker Dep. at 27, 32.) Nurse Newman informed Nurse Walker that Nurse Newman did not want to be alone with Plaintiff when Plaintiff returned to the nurses station. (Newman Dep. at 28; Walker Dep. at 28.)

On that same day, Nurse Walker telephoned Bernadette Martin, the Human Resources Manager for the Bandy Plant. (Martin Decl. ¶ 8; Walker Decl. ¶ 7; Walker Dep. at 33; Dep. of Bernadette Martin at 55.) Nurse Walker informed Ms. Martin that a verbal confrontation had occurred between Plaintiff and Nurse Newman. (Martin Decl. ¶ 9; Walker Dep. at 34–35; Martin Dep. at 55–56.) Nurse Walker reported that Plaintiff had become loud, belligerent, and uncooperative, and that Plaintiff had thrown a piece of paper at Nurse Newman. (Martin Decl. ¶ 9; Walker Dep. at 34–35; Martin Dep. at 55–58.) Nurse Walker indicated that she and Nurse Newman were upset. (Martin Decl. ¶ 9; Walker Dep. at 35.)

Meanwhile, Plaintiff traveled to his doctor's office and obtained additional information from his physician. (D. Couts Aff. ¶ 38; D. Couts Dep. at 244–45.) Later on August 23, 2001, Plaintiff returned to the nurses' station to present the additional documentation and to obtain a return to work release. (Walker Decl. ¶ 8; D. Couts Aff. ¶ 38; Newman Dep. at 29; Walker Dep. at 36; D. Couts Dep. at 245.)

Nurse Walker met with Plaintiff when Plaintiff returned to the nurses station. (Walker Decl. ¶ 8; D. Couts Aff. ¶ 39; Walker Dep. at 36–38; D. Couts Dep. at 246.) Plaintiff gave Nurse Walker a note from Plaintiff's physician that did not specify Plaintiff's work restrictions. (Walker Decl. ¶ 9; Walker Dep. at 40–41.)

Nurse Walker informed Plaintiff that the new documentation still was insufficient. (D. Couts Aff. ¶ 40; D. Couts Dep. at 246.) Nurse Walker, however, called Plaintiff's physician, who indicated that Plaintiff was capable of returning to full duty without restrictions. (Walker Decl. ¶¶ 9–10; D. Couts Aff. ¶ 40; Walker Dep. at 42, 51.) Nurse Walker concluded that Plaintiff could return to full duty without restrictions, and prepared a return to work release without restrictions. (Walker Decl. ¶ 12; D. Couts Aff. ¶ 49 & Ex. F; Walker Dep. at 62; D. Couts Dep. at 249, 261, 263.)

Nurse Walker informed Plaintiff that Plaintiff's actions had made Nurse Newman feel uncomfortable and had intimidated Nurse Newman. (D. Couts Aff. ¶ 42; Walker Dep. at 45; D. Couts Dep. at 247.) Nurse Walker told Plaintiff that she had contacted Defendant's Human Resources Department to report Plaintiff's behavior. (D. Couts Aff. ¶ 43; D. Couts Dep. at 246.)

Plaintiff denied engaging in behavior that would have intimidated Nurse Newman, and indicated that he did not "argue with, assault, yell at, become loud or angry toward, intimidate, or act hostile or disrespectful to Nurse Newman" and that "he did not throw any object at or toward Nurse Newman." (D. Couts Aff. ¶ 44.) Nurse Walker, however, requested that Plaintiff apologize to Nurse Newman. (D. Couts Aff. ¶ 45; Walker Dep. at 45; D. Couts Dep. at 247.) Plaintiff "agreed to apologize to Nurse Newman if an apology was all that was necessary to resolve the matter." (D. Couts Aff. ¶ 45.)

Plaintiff informed Nurse Newman that Plaintiff "did not intend to do or say any-

thing to make her feel either uncomfortable or intimidated and that if something that deponent did or said made Nurse Newman feel this way, deponent was sorry." (D. Couts Aff. ¶ 46; Newman Dep. at 29; D. Couts Dep. at 247.) Nurse Newman accepted Plaintiff's apology, and shook Plaintiff's hand. (D. Couts Aff. ¶ 46; Newman Dep. at 29; Walker Dep. at 45–46.) Nurse Walker informed Defendant's Human Resources Department that Plaintiff had apologized to Nurse Newman. (Newman Dep. at 31; Walker Dep. at 59–60.)

### 6. Report to Plaintiff's Department Manager

Ms. Martin subsequently contacted Rick McAfee, who served as Plaintiff's department manager, to relay the information given to Ms. Martin by Nurse Walker. (Martin Decl. ¶ 10; Martin Dep. at 60–61; Dep. of Rick McAfee at 80.) Ms. Martin informed Mr. McAfee that Plaintiff had created a scene at the nurses station, and that Plaintiff had spoken loudly and yelled. (McAfee Dep. at 80.) Mr. McAfee came to Defendant's Human Resources Department to discuss the report. (Martin Dep. at 61–62; McAfee Dep. at 83–84.)

Mr. McAfee chose to investigate the allegations made by Nurse Walker and Nurse Newman. (Martin Decl. ¶ 11; Martin Dep. at 62.) Mr. McAfee suspended Plaintiff from his employment pending the outcome of the investigation. (Martin Decl. ¶ 11; D. Couts Aff. ¶ 50; Martin Dep. at 89; D. Couts Dep. at 251.)

Mr. McAfee conducted an investigation of the allegations against Plaintiff. (McAfee Dep. at 85.) As part of that investigation, Mr. McAfee contacted the nurses station. (*Id.* at 81–82, 97–99.) The nurses reported that Plaintiff had yelled, screamed, cursed, and scared the nurses, and that Plaintiff had thrown a piece of

paper at the nurses. (*Id.* at 81–82.) Mr. McAfee also spoke with other employees of Defendant who claimed to have experienced similar confrontations with Plaintiff. (*Id.* at 93, 96, 100–02.) Mr. McAfee, however, did not discuss the allegations with Plaintiff as part of his investigation. (*Id.* at 112.)

After concluding his investigation, Mr. McAfee met with Ms. Martin. (Martin Decl. ¶ 12; Martin Dep. at 63; McAfee Dep. at 109.) Mr. McAfee informed Ms. Martin that he wanted to terminate Plaintiff's employment based on the alleged incident with Nurse Newman and other alleged similar incidents.[1] (McAfee Dep. at 109; Martin Decl. ¶ 12; Martin Dep. at 63.)

Ms. Martin advised Mr. McAfee that the decision to terminate Plaintiff was consistent with Defendant's policies. (Martin Decl. ¶ 12; Martin Dep. at 64–65.) Mr. McAfee, however, made the ultimate decision to terminate Plaintiff. (Def.'s Resps. Pl.'s First Interrogs. No. 4; Martin Dep. at 64–65, 71.)

### 7. Plaintiff's Termination

On August 24, 2001, Mr. McAfee and George Binn, one of Defendant's shift supervisors for the shipping department, met with Plaintiff in Defendant's Human Resources Department. (D. Couts Aff. ¶ 51; Martin Dep. at 71; McAfee Dep. at 110; D. Couts Dep. at 218–19.) During the August 24, 2001, meeting, Mr. McAfee terminated Plaintiff's employment for " 'yelling, screaming and trying to intimidate the nurses at the nurses station.' " (D. Couts Dep. at 218, 253; D. Couts Aff. ¶ 52; McAfee Dep. at 110.) Plaintiff denied engaging in such behavior; however, Plaintiff claims that he never had an opportunity to present his side of the story before Mr.

---

1. Plaintiff denies that any alleged similar inci-    dents occurred. (D. Couts Aff. ¶¶ 57–61.)

McAfee decided to terminate Plaintiff's employment. (D. Couts Dep. at 219–221; D. Couts Aff. ¶¶ 53, 55.)

Mr. McAfee did not mention Plaintiff's rapid heartbeat condition during the August 24, 2001, meeting. (D. Couts Dep. at 222.) In fact, Mr. McAfee did not discuss Plaintiff's medical condition at all. (*Id.* at 225.) After his termination, Plaintiff left the Bandy Plant without incident. (D. Couts Aff. ¶ 54.)

### 8. Knowledge Concerning Plaintiff's Condition

Prior to Plaintiff's termination, Ms. Martin had no knowledge concerning Plaintiff's medical condition. (Martin Decl. ¶ 15.) Ms. Martin had no conversations with Nurses Walker or Newman concerning Plaintiff's medical condition, and Ms. Martin did not review Plaintiff's medical file prior to Plaintiff's termination. (Martin Decl. ¶ 15; Walker Decl. ¶ 17.)

Nurse Walker never saw documents indicating or implying that Plaintiff had a disability or a serious medical condition. (Walker Decl. ¶ 13.) In any event, Nurse Walker was not involved in the decision to terminate Plaintiff. (*Id.* ¶ 14.) Nurse Walker never told Ms. Martin or any other Human Resources employee that Plaintiff was not able to work, that Plaintiff had medical restrictions, or that Plaintiff had a medical condition or a heart condition. (Walker Decl. ¶ 16; Walker Dep. at 60.) Nurse Walker never told Mr. McAfee or Mr. Butler that Plaintiff was not able to work, that Plaintiff had medical restrictions, or that Plaintiff had a medical condition or a heart condition. (Walker Decl. ¶ 17.) Nurse Walker also did not forward Plaintiff's medical documentation to Defendant's Human Resources Department. (Walker Dep. at 56.)

Nurse Newman had no knowledge concerning Plaintiff's specific diagnosis, restrictions, or limitations. (Newman Dep. at 41.) Nurse Newman assumed that Plaintiff had no restrictions or limitations. (*Id.*) In any event, Nurse Newman did not discuss Plaintiff's medical condition with Mrs. Martin, Mr. Butler, Mr. McAfee, or any employee of Defendant's Human Resources Department. (*Id.* at 42–43.)

Mr. McAfee never reviewed Plaintiff's medical file prior to Plaintiff's termination. (Walker Decl. ¶ 17.) Additionally, Plaintiff never discussed his medical condition with Mr. McAfee. (D. Couts Aff. ¶ 56; D. Couts Dep. at 201.) Mr. McAfee heard that Plaintiff had been sick; however, Mr. McAfee had no specific information concerning Plaintiff's medical condition. (McAfee Dep. at 113, 118, 120.) Mr. McAfee did not ask why Plaintiff had been absent from work, and Mr. McAfee did not review the documents that Plaintiff provided to the nurses. (*Id.* at 121.)

Mr. Butler also never reviewed Plaintiff's medical file prior to Plaintiff's termination. (Walker Decl. ¶ 17.) Plaintiff claims that he informed Mr. Butler of Plaintiff's heart problems. (D. Couts Aff. ¶ 27.) Plaintiff and Mr. Butler, however, simply discussed Plaintiff's chronic obstructive pulmonary disease ("COPD"), and did not discuss other medical conditions. (Butler Dep. at 30–31.) During the conversation, Mr. Butler did not discuss Plaintiff's limitations. (*Id.* at 48.) In fact, Mr. Butler thought that Plaintiff had no limitations, and that Plaintiff was healthy and could perform his job. (*Id.* at 48–49.) Mr. Butler was not aware of Plaintiff's rapid heartbeat condition. (Butler Dep. at 49; D. Couts Dep. at 201.)

### B. Procedural Background

On January 25, 2002, Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"). (D. Couts Dep. Def.'s Ex. 14.) On June 22, 2002, the EEOC issued a right

to sue letter to Plaintiff. (Compl. ¶ 18 & Ex. A.)

On August 28, 2002, Plaintiff filed this lawsuit. Plaintiff alleges that Defendant discriminated against him on the basis of his disability—his acute supraventricular re-entrant tachycardia, or rapid heartbeat condition—when Defendant terminated his employment.

On August 28, 2003, Defendant filed its Motion for Summary Judgment. Defendant argues that Plaintiff cannot establish a prima facie case of discrimination under the ADA, because Plaintiff cannot demonstrate that he suffers from a disability. Alternatively, Defendant contends that Plaintiff cannot prove that Defendant's stated reasons for terminating Plaintiff's employment were a pretext for discrimination. Because the Court concludes *infra* Part III. that Plaintiff has failed to establish a prima facie case of disability discrimination, the Court does not determine whether Defendant's stated reasons for terminating Plaintiff's employment were a pretext for discrimination.

## II. Summary Judgment Standard

### A. In General

Federal Rule of Civil Procedure 56(c) authorizes summary judgment when all "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). In short, everything in the record must demonstrate the absence of a genuine issue of material fact. *Herzog v. Castle Rock Entertainment*, 193 F.3d 1241, 1246 (11th Cir.1999).

The party seeking summary judgment bears the burden of demonstrating the absence of a genuine dispute as to any material fact. *Herzog*, 193 F.3d at 1246 (citing *Adickes v. S.H. Kress & Co.*, 398

U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970)). The party requesting summary judgment "'always bears the initial responsibility of informing the district court of the basis of its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.'" *Graham v. State Farm Mut. Ins. Co.*, 193 F.3d 1274, 1281 (11th Cir.1999) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)) (internal quotation marks omitted). "The movant[ ] can meet this burden by presenting evidence showing that there is no dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof." *Id.* at 1281–82. "There is no requirement, however, 'that the moving party support its motion with affidavits or other similar materials negating the opponent's claim.'" *Id.* at 1282 (quoting *Celotex*, 477 U.S. at 323, 106 S.Ct. 2548).

Once the moving party has supported its motion adequately, the non-movant has the burden of showing summary judgment is improper by coming forward with specific facts that demonstrate the existence of a genuine issue for trial. *Graham*, 193 F.3d at 1282; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The non-moving party "need not present evidence in a form necessary for admission at trial; however, he may not merely rest on his pleadings." *Graham*, 193 F.3d at 1282.

After the non-moving party properly has responded to a proper motion for summary judgment, the Court may grant the motion for summary judgment if the Court concludes that there is no genuine issue of

material fact and that the moving party is entitled to summary judgment as a matter of law. *St. Charles Foods, Inc. v. Am.'s Favorite Chicken Co.,* 198 F.3d 815, 819 (11th Cir.1999). When making this determination, the Court must view the evidence and all factual inferences in the light most favorable to the party opposing the motion. *Hinson v. Edmond,* 192 F.3d 1342, 1348 (11th Cir.1999); *St. Charles Foods, Inc.,* 198 F.3d at 819. The Court also must " 'resolve all reasonable doubts about the facts in favor of the non-movant.' " *St. Charles Foods, Inc.,* 198 F.3d at 819 (quoting *United of Omaha Life Ins. v. Sun Life Ins. Co.,* 894 F.2d 1555 (11th Cir.1990)). Additionally, " '[i]f reasonable minds might differ on the inferences arising from undisputed facts, then the court should deny summary judgment.' " *Id.* (quoting *Warrior Tombigbee Transp. Co. v. M/V Nan Fung,* 695 F.2d 1294, 1296–97 (11th Cir.1983)) (alteration in original). Moreover, "credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are the function of the jury." *Graham,* 193 F.3d at 1282. Finally, "[i]f the record presents factual issues, the court must not decide them; it must deny the motion and proceed to trial." *Herzog,* 193 F.3d at 1246.

When considering motions for summary judgment, the Court does not make decisions as to the merits of disputed factual issues. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Ryder Int'l Corp. v. First Am. Nat'l Bank,* 943 F.2d 1521, 1523 (11th Cir.1991). Rather, the Court only determines whether genuine issues of material fact exist to be tried. *Graham,* 193 F.3d at 1282. Applicable substantive law identifies those facts that are material and those that are irrelevant. *Id.* Disputed facts that do not resolve or affect the outcome of a suit properly will not preclude the entry of summary judgment. *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505.

In addition to materiality, the Court also must consider the genuineness of the alleged dispute. *Graham,* 193 F.3d at 1282. A dispute is genuine if " 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.' " *Id.* (quoting *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505). The non-movant " 'must do more than show that there is some metaphysical doubt as to the material facts.' " *Id.* (quoting *Matsushita,* 475 U.S. at 586, 106 S.Ct. 1348). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.' " *Matsushita,* 475 U.S. at 587, 106 S.Ct. 1348 (quoting *First Nat'l Bank v. Cities Serv. Co.,* 391 U.S. 253, 289, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968)). The standard for summary judgment thus mirrors the "standard necessary to direct a verdict: 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.' " *Graham,* 193 F.3d at 1283 (quoting *Anderson,* 477 U.S. at 251–52, 106 S.Ct. 2505).

**B. Summary Judgment Standard for Employment Cases**

Until recently, some previous Eleventh Circuit opinions purported to announce " '[a]s a general rule [that] summary judgment is not a proper vehicle for resolving claims of employment discrimination which often turn on an employer's motivation and intent.' " *Chapman v. AI Transp.,* 229 F.3d 1012, 1025 (11th Cir.2000) (en banc) (collecting cases). The Eleventh Circuit has acknowledged that there is no question that this rule "has not been followed in recent years." *Id.* The Eleventh Circuit also has observed: " 'Summary judgment is hardly unknown, or for that matter rare, in employment discrimination cases, more than 90 percent of which are resolved before trial, . . . many of them on the basis of

summary judgment for the defendant.'" *Id.* (quoting *Wallace v. SMC Pneumatics, Inc.*, 103 F.3d 1394, 1396 (7th Cir.1997) (citations omitted)). The Eleventh Circuit also has recognized that while "questions of fact in job discrimination cases are 'both sensitive and difficult' and '[t]here will seldom be eyewitness testimony as to the employer's mental processes,' the Supreme Court has told us that 'none of this means that trial courts or reviewing courts should treat discrimination differently from other ultimate questions of fact.'" *Id.* (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 524, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993)) (internal quotation marks omitted) (alteration in original). The Eleventh Circuit therefore has abrogated its earlier cases that question the applicability of summary judgment for employment discrimination cases, and has stated: "The long and short of it is that the summary judgment rule applies in job discrimination cases just as in other cases. No thumb is to be placed on either side of the scale." *Id.*

## III. Discussion

### A. Framework for Analyzing an ADA Claim

■ Plaintiff may prove his claim of discrimination under the ADA by using direct, statistical, or circumstantial evidence. *Lewis v. Zilog, Inc.*, 908 F.Supp. 931, 951 (N.D.Ga.1995). Here, Plaintiff's claim of discrimination relies solely upon circumstantial evidence. (Pl.'s Br. Resp. Def.'s Mot. Summ. J. at 6.)

Congress and the courts have developed a specialized procedure whereby a plaintiff may establish an employment discrimination claim using circumstantial evidence. *See Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181, 1184 (11th Cir. 1984). This procedure commonly is known as the "burden-shifting analysis." Under Eleventh Circuit law, the burden-shifting analysis used to evaluate Title VII claims also applies to ADA claims based on circumstantial evidence. *Earl v. Mervyns, Inc.*, 207 F.3d 1361, 1365 (11th Cir.2000).

The burden-shifting analysis first requires the plaintiff to establish a prima facie case of the defendant's discriminatory motive. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993); *Tidwell v. Carter Prods.*, 135 F.3d 1422, 1426 (11th Cir. 1998). After the plaintiff establishes a prima facie case, a presumption of discriminatory intent arises, and the burden of production next shifts to the defendant to articulate legitimate, non-discriminatory reasons for the adverse employment action. *Hicks*, 509 U.S. at 506–07, 113 S.Ct. 2742; *Texas Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *Tidwell*, 135 F.3d at 1426. If the defendant articulates legitimate, non-discriminatory reasons for its actions, "the presumption created by plaintiff's prima facie case drops from the picture." *Tidwell*, 135 F.3d at 1426; *Trotter v. Bd. of Trs. of Univ. of Ala.*, 91 F.3d 1449, 1455 (11th Cir.1996). The burden then shifts back to the plaintiff to show that the defendant's proffered legitimate, non-discriminatory reasons are a pretext for discrimination or are not credible. *Hicks*, 509 U.S. at 507, 113 S.Ct. 2742; *Williams v. Vitro Servs. Corp.*, 144 F.3d 1438, 1441 (11th Cir.1998); *Combs v. Plantation Patterns*, 106 F.3d 1519, 1529 (11th Cir.1997); *Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1081 (11th Cir.1990).

### B. Plaintiff's Prima Facie Case

■ The ADA prohibits an employer from discriminating against an employee based on a known physical or mental impairment. 42 U.S.C.A. § 12112. The Eleventh Circuit has created a three-part test to determine whether a plaintiff has

established a prima facie case of discrimination under the ADA. *Earl,* 207 F.3d at 1365; *Reed v. Heil Co.,* 206 F.3d 1055, 1061 (11th Cir.2000). "To establish a prima facie case of discrimination under the ADA, a plaintiff must show: (1) she is disabled; (2) she is a qualified individual; and (3) she was subjected to unlawful discrimination because of her disability." *Earl,* 207 F.3d at 1365. The plaintiff bears the burden of proving by a preponderance of the evidence all the elements of his prima facie case.

The Court first must determine whether Plaintiff has established that Plaintiff has a disability. The ADA defines a disability as "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) having a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C.A. § 12102(2).

### 1. Whether Plaintiff Has a Physical or Mental Impairment that Satisfies the ADA's Requirements

A physical or mental impairment, for purposes of the ADA, is a disorder or condition that affects "one or more of the following body systems: neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genitourinary, hemic and lymphatic, skin and endocrine." 29 C.F.R. § 1630.2(h)(1). A person is substantially limited for purposes of the ADA if he is significantly restricted as to the condition, manner, or duration under which he can perform a major life activity as compared to the average person. 29 C.F.R. § 1630.2(j)(ii).

To the extent that Plaintiff argues that Plaintiff indeed suffers from an actual disability, Plaintiff has presented evidence that Plaintiff experiences "acute supraventricular re-entrant tachycardia," or a "rapid heartbeat condition." (Pl.Aff.¶ 7.) Simply having an impairment or condition, however, is not sufficient to satisfy the ADA's requirements. *Toyota Motor Mfg., Ky., Inc. v. Williams,* 534 U.S. 184, 195, 122 S.Ct. 681, 151 L.Ed.2d 615 (2002); *Hill v. Metro. Atlanta Transit Auth.,* 77 F.Supp.2d 1291, 1295–96 (N.D.Ga.1999); *Quick v. Tripp, Scott, Conklin & Smith, P.A.,* 43 F.Supp.2d 1357, 1365 (S.D.Fla. 1999); *Toedtli v. The Gillette Co.,* No. 1:97–CV–3549–TWT, 1999 WL 186607, at *9 (N.D.Ga. Feb. 17, 1999), *aff'd,* 202 F.3d 288 (11th Cir.1999). Instead, the impairment must substantially limit one or more of Plaintiff's major life activities. *Toyota Motor Mfg., Ky., Inc.,* 534 U.S. at 195, 122 S.Ct. 681; *Hill,* 77 F.Supp.2d at 1296; *Quick,* 43 F.Supp.2d at 1365; *Toedtli,* 1999 WL 186607, at *9.

■ To the extent that Plaintiff argues that his rapid heartbeat condition substantially limits the major life activity of working, a claimant alleging such a limitation must "show an inability to work in a 'broad range of jobs,' rather than a specific job." *Toyota Motor Mfg., Ky., Inc.,* 534 U.S. at 200, 122 S.Ct. 681. "To be substantially limited in the major life activity of working, an individual must be precluded from more than one type of job, even if the job foreclosed is the individual's job of choice." *Cash v. Smith,* 231 F.3d 1301, 1306 (11th Cir.2000). "If jobs utilizing an individual's skills are available, that individual is not considered substantially limited in her ability to work." *Id.*

■ Here, Plaintiff has failed to show that his rapid heartbeat condition precluded Plaintiff from working in a broad range of jobs. At most, Plaintiff has presented evidence indicating that Plaintiff's rapid heartbeat condition had occurred approximately four or five times since its diagnosis in 1999, and that the rapid heartbeat condition required hospitalization for approximately one to two days, with residual

pain remaining for one to two days. The evidence in the record, however, shows that Plaintiff's rapid heartbeat condition is controlled by medication, and that Plaintiff can participate in household activities and other activities of daily living, without limitation. (D. Couts Aff. ¶ 8; C. Couts Dep. at 51, 141; D. Couts Dep. at 88, 188–89, 197, 199–200.) The evidence also demonstrates that Plaintiff could perform the requirements of his job with Defendant without limitation, restriction, or accommodation. (D. Couts Dep. at 88, 165, 189, 282.) Plaintiff thus has failed to show that he has an actual physical or mental impairment that satisfies the requirements of the ADA.

■ Plaintiff testified in his deposition that he has applied for Social Security disability benefits. Even if Plaintiff eventually obtains an award of disability benefits from the Social Security Administration, it does not follow that he is disabled under the ADA. An individual may receive disability benefits from the Social Security Administration and yet not have an impairment that substantially limits one or more major life activities for purposes of the ADA. *Horwitz v. L. & J.G. Stickley, Inc.,* 20 Fed.Appx. 76, 80, 2001 WL 1220511 (2d Cir.2001) (receiving social security disability benefits does not establish that plaintiff is disabled under ADA); *Weiler v. Household Fin. Corp.,* 101 F.3d 519, 524 (7th Cir.1996) ("Because the ADA's determination of disability and a determination under the Social Security disability system diverge significantly in their respective legal standards and statutory intent, determinations made by the Social Security Administration concerning disability are not dispositive findings for claims arising under the ADA."). Absent some other evidence showing that Plaintiff's rapid heartbeat condition limits Plaintiff's ability to work in a broad range of jobs, Plaintiff cannot rely on his application for Social Security disability benefits to establish that Plaintiff is substantially limited in the major life activity of working.

In sum, Plaintiff simply has produced no evidence showing that his rapid heartbeat condition precluded him from working in a broad class of jobs. Plaintiff therefore has not demonstrated that his rapid heartbeat condition substantially limited him in engaging in the major life activity of working. Plaintiff also has failed to show that his rapid heartbeat condition substantially limited any other major life activity. Consequently, Plaintiff has not established that he suffers from a disability, as defined by the ADA.

**2. Whether Defendant Regarded Plaintiff as Having Such an Impairment**

■ Plaintiff appears to argue that Defendant regarded Plaintiff as disabled. To the extent that Plaintiff claims that Defendant was aware that Plaintiff suffered from a rapid heartbeat condition, such an awareness, without more, is not sufficient to show that Defendant regarded Plaintiff as disabled for purposes of the ADA. *Hilburn v. Murata Elecs. N. Am., Inc.,* 181 F.3d 1220, 1230 (11th Cir.1999). Instead, the "perceived impairment must be believed to substantially limit a major life activity of the individual." *Id.* (citing *Standard v. A.B.E.L. Servs., Inc.,* 161 F.3d 1318, 1327 (11th Cir.1998)). Here, Plaintiff has presented absolutely no evidence that even suggests that Defendant believed that Plaintiff had an impairment that substantially limited any major life activities. Indeed, the evidence in the record, viewed in the light most favorable to Plaintiff, shows that Mr. McAfee, who made the decision to terminate Plaintiff's employment, had no information concerning Plaintiff's rapid heartbeat condition. (Walker Decl. ¶ 17; D. Couts Aff. ¶ 56; D. Couts Dep. at 201; McAfee Dep. At 113,

118, 120–21.) Plaintiff thus cannot show that Defendant regarded Plaintiff as having a disability.

Further, the Supreme Court has explained that the essence of a "regarded as" disabled claim is misperception:

> There are two apparent ways in which individuals may fall within this statutory definition: (1) a covered entity mistakenly believes that a person has a physical impairment that substantially limits one or more major life activities, or (2) a covered entity mistakenly believes that an actual, nonlimiting impairment substantially limits one or more major life activities. In both cases, it is necessary that a covered entity entertain misperceptions about the individual—it must believe either that one has a substantially limiting impairment that one does not have or that one has a substantially limiting impairment when, in fact, the impairment is not so limiting.

*Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 489, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999). Here, both Plaintiff and Defendant agree that Plaintiff has a rapid heartbeat condition.

Plaintiff, however, has failed to show that any misperceptions existed on Defendant's part with respect to Plaintiff's rapid heartbeat condition. Under these circumstances, Plaintiff cannot contend that Defendant regarded Plaintiff as disabled for purposes of the ADA. *McCollough v. Atlanta Beverage Co.*, 929 F.Supp. 1489, 1498 (N.D.Ga.1996) (noting defendant did not regard plaintiff as disabled for purposes of ADA simply because defendant discontinued plaintiff's lifting duties as result of representations made by plaintiff and plaintiff's physician); *see also Hilburn*, 181 F.3d at 1230 (concluding defendant did not regard plaintiff as disabled for purposes of ADA where defendant's recognition of plaintiff's limitations was recognition of fact, rather than erroneous perception);

*Bute v. Schuller Int'l Inc.*, 998 F.Supp. 1473, 1477 (N.D.Ga.1998) (same).

### 3. Whether Plaintiff Has a Record of an Impairment

Plaintiff also may argue that Plaintiff is disabled for purposes of the ADA because Plaintiff has a record of an impairment. "The intent of the 'record of' prong of the ADA, in part, 'is to ensure that people are not discriminated against because of a history of disability.'" *Horwitz*, 20 Fed. Appx. at 78 (quoting 29 C.F.R. Pt. 1640 App. § 1630.2(k)). A person has a record of a disability if "'a record relied upon by an employer indicates that the individual has or had a substantially limiting impairment.'" *Id.* (quoting 29 C.F.R. Pt. 1640 App. § 1630.2(k)).

For two reasons, Plaintiff has failed to show that he has a record of a disability, as defined by the ADA. First, Plaintiff has failed to show the existence of any record that indicates that Plaintiff has, or had, a substantially limiting impairment. Second, even if such a record exists, no evidence before the Court even hints that Mr. McAfee, who made the decision to terminate Plaintiff, was aware of it. (Walker Decl. ¶ 17; D. Couts Aff. ¶ 56; D. Couts Dep. at 201; McAfee Dep. at 113, 118, 120–21.) Under these circumstances, Plaintiff has failed to show that he has a record of an impairment, as defined by the ADA. *Lawson v. CSX Transp., Inc.*, 245 F.3d 916, 927 n. 10 (7th Cir.2001) ("Along with a showing that a record of a substantially limiting impairment exists, a plaintiff must also demonstrate that the employer knew of that record."); *Bailey v. Charlotte–Mecklenburg Bd. of Educ.*, No. 3:98CV565–MU, 2001 WL 1019736, at *10 (W.D.N.C. April 3, 2001) (same).

### 4. Summary

In sum, the Court concludes that Plaintiff has failed to show that he is disabled

**1306**

under any of the three definitions set forth in the ADA. Plaintiff therefore cannot establish a genuine dispute with respect to his prima facie case of discrimination relating to his ADA claim, and the Court grants Defendant's Motion for Summary Judgment with respect to that claim. Because the Court concludes that Plaintiff has failed to prove a prima facie case of discrimination under the ADA, the Court does not address the issue of pretext.

## IV.  Conclusion

ACCORDINGLY, the Court **GRANTS** Defendant's Motion for Summary Judgment [21] and **DISMISSES** Plaintiff's case.  The Court **DIRECTS** the Clerk to **CLOSE** this case.

### *JUDGMENT*

This action having come before the court, Honorable HAROLD L. MURPHY, United States District Judge, for consideration of defendant's motion for summary judgment, and the court having granted said motion, it is

**Ordered and Adjudged** that the plaintiff take nothing; that the defendant recover its costs of this action, and the action be, and the same hereby, is **dismissed.**