

**FILED**

Apr 18 2018, 9:19 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

Daniel Siewers
Katie Kotter
Hart Bell, LLC
Vincennes, Indiana

ATTORNEY FOR APPELLEE

Michael C. Healy
Indiana Civil Rights Commission
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Knox County Association for
Retarded Citizens, Inc.,

*Appellant-Defendant,*

v.

Melissa (Cope) Davis,

*Appellee-Plaintiff*

April 18, 2018

Court of Appeals Case No.
93A02-1701-EX-141

Appeal from the Indiana Civil
Rights Commission

Alpha Blackburn, Commissioner
Sheryl Edwards, Commissioner
Steven Ramos, Commissioner
Ahmed Young, Commissioner

Docket No.
EMHA12091467

**May, Judge.**

[1] Knox County Association for Retarded Citizens, Inc. ("KCARC") appeals the Indiana Civil Rights Commission's ("ICRC") conclusion that KCARC engaged in an unlawful discriminatory practice when it terminated Mellissa Davis' employment with KCARC. KCARC presents two issues for our review, which we restate, generally:

> 1. Whether the ICRC's conclusion that KCARC engaged in discriminatory practices when it terminated Davis' employment was supported by substantial evidence and applicable law; and

> 2. Whether the amount of the ICRC's monetary reward to Davis was supported by substantial evidence and applicable law.

[2] We affirm in part, reverse in part, and remand.

# Facts and Procedural History[1]

[3] KCARC provides services to individuals with disabilities including residential care, group home care, educational assistance, and occupational assistance. Davis began working for KCARC as a Direct Support Professional ("DSP") on March 12, 2012. Davis worked to KCARC's satisfaction until August 26, 2012, when Davis left work for an unknown medical issue. The ICRC found, regarding this incident:

---

[1] We held oral argument on this case on February 22, 2018, at Vincennes University. We thank the university for its hospitality and the students for their excellent participation.

[8.] . . . On this day, Davis arrived to work at Group Home 11 confused and incoherent. She was unsure on how she arrived to work that day, Davis' heart raced, and she could not walk. Davis went to the emergency room that day to receive a diagnosis on her health conditions. When Davis arrived to work the next day, Supervisor Shonk informed Davis she could not return to work without a written note from the doctor releasing her back to work.

(App. Vol. II at 5.) Davis then sought follow-up medical treatment:

9. Davis made an appointment to see Dr. Nibel. Dr. Nibel saw Davis on August 30, 2012. Dr. Nibel diagnosed Davis as having a loss of consciousness or a "syncopal episode" but was unable to determine what caused this to occur. Dr. Nibel sent Davis back to work on August 31, 2012 to light duty. There were no details as to what "light duty" entailed. [Amy] O'Dell, HR Supervisor, called Davis to get further clarification.

10. On September 7, 2012, Davis proposed [sic] O'Dell with an additional letter from Dr. Nibel clarifying her "light duty" restrictions. Dr. Nibel explained that Ms. Davis was suffering from a medical condition that was causing some dizziness and headaches. The dizziness could be caused by bending, stooping, rapid or repetitive rotational movements. Dr. Nibel also restricted Ms. Davis from lifting anything heavier than ten (10) pounds. Dr. Nibel recommended that Ms. Davis had [sic] a job that consisted of mostly sitting but did not require Davis to be in a sitting position for the entire eight (8) hour work day.

(*Id.* at 5-6.) On September 7, 2012, after conferring with KCARC Vice President Jeff Darling, O'Dell decided to terminate Davis because "there were no positions available to which [sic] met with [Davis'] work restrictions." (*Id.*

at 47.) O'Dell encouraged Davis to reapply for the DSP position once Dr. Nibel lifted the restrictions on her ability to work.

[4] On September 17, 2012, Davis filed a Complaint of Discrimination with the ICRC. She alleged:

> I believe I was discriminated against on the basis of a perceived disability. After suffering from my disability at work, I was sent home. When I returned to work the next day, I was told I needed a doctor's note. I got a doctor's note that put me on light duty until further notice, so the doctor could do more tests to figure out what was going on with me. I was told that since I couldn't perform all the duties of my job while on light duty I "voluntarily terminating" [sic] my employment.

(*Id.* at 17.) As part of a second pre-hearing order, the ICRC identified the issues before it, as defined by the parties in a conference call on April 15, 2014, as

> whether (1) [Davis] had a disability or was regarded as having a disability; (2) KCARC discriminated against [Davis] because of the disability or perceived disability by denying a reasonable accommodation when KCARC terminated [Davis'] employment; and (3) what remedies [Davis] may be entitled to.

(*Id.* at 18-19.) On September 15-16, 2015, Administrative Law Judge ("ALJ") Noell F. Allen held hearings in Vincennes. The parties and the ALJ also convened telephonically on September 30, 2015.

[5] On April 13, 2016, the ALJ issued a Proposed Findings of Fact, Conclusions of Law, and Order ("Proposed Order") that awarded Davis back pay damages of $25,837.37. On April 28, 2016, KCARC filed its objections to the proposed

order. On August 26, 2016, the ICRC heard oral argument on KCARC's objections. On December 19, 2016, the ICRC adopted the ALJ's Proposed Order, but changed the amount of damages to include pre-judgment interest for a total damage award of $35,131.46.

# Discussion and Decision[2]

## I. Standard of Review

[6] The standard by which we review decisions from administrative agencies is well-settled:

> In reviewing an administrative decision, we must determine "whether substantial evidence, together with any reasonable inferences that flow from such evidence, support the [agency's] findings and conclusions." *Walker v. Muscatatuck State Dev. Ctr.*, 694 N.E.2d 258, 266 (Ind. 1998). In doing so, we do not reweigh the evidence or judge the credibility of witnesses, and we consider only the evidence most favorable to the ICRC's findings. *McClain v. Review Bd. of Ind. Dep't of Workforce Dev.*, 693 N.E.2d 1314, 1317 (Ind. 1998), *reh'g denied*. However, if the question before us is primarily a legal question, "we do not grant

---

[2] At the onset, we would like to note the lack of civility between the parties in this case, both in their briefs and during oral argument. Unnecessarily argumentative and snide comments such as, "Of course, the fact that Davis can't seem to consistently state the nature of her alleged disability is because she doesn't suffer from one[,]" (Br. of Appellant at 24), and "had the Commission actually bothered to read the case they cited in support of their conclusion that Davis is disabled, they would have discovered that it actually stands for the exact opposite of their assertion," (*id*. at 27), as well as conduct during the oral argument, degrade the parties' arguments by showcasing the incivility between the parties. We remind counsel of sections 1 and 9 of the Preamble to the Indiana Rules of Professional Conduct, which state: "Whether or not engaging in the practice of law, lawyers should conduct themselves honorably[;]" and "[The principles of the Rules of Professional Responsibility] include the lawyer's obligation to protect and pursue a client's legitimate interests, within the bounds of the law, while maintaining a professional, courteous and civil attitude toward all persons involved in the legal system."

the same degree of deference to the [agency's] decision, for law is the province of the judiciary and our constitutional system empowers the courts to draw legal conclusions." *Walker*, 694 N.E.2d at 266. Thus, we review conclusions of law to determine whether the ICRC correctly interpreted and applied the law. *M & J Mgmt., Inc. v. Review Bd. of Dep't of Workforce Dev.*, 711 N.E.2d 58, 61 (Ind. Ct. App. 1999).

*Zeller Elevator Co. v. Slygh*, 796 N.E.2d 1198, 1206 (Ind. Ct. App. 2003), *trans. denied*. In *McClain v. Review Bd. of Ind. Dep't of Workforce Dev.*, 693 N.E.2d 1314, 1317 (Ind. 1998), *reh'g denied*, our Indiana Supreme Court explained:

> [An agency's] conclusions as to ultimate facts involve an inference or deduction based on the findings of basic fact. These questions of ultimate fact are sometimes described as "questions of law." They are, however, more appropriately characterized as mixed questions of law and fact. As such, they are typically reviewed to ensure that the Board's inference is "reasonable" or "reasonable in light of [the Board's] findings." The term "reasonableness" is conveniently imprecise. Some questions of ultimate fact are within the special competence of the Board. If so, it is appropriate for a court to exercise greater deference to the "reasonableness" of the Board's conclusion. . . . In evaluating this conclusion, if no proposition of law is contravened or ignored by the agency conclusions, the "reasonable" inference standard gives deference to the agency determination. However, not all ultimate facts are within the Board's area of expertise. As to these, the reviewing court is more likely to exercise its own judgment. In either case the court examines the logic of the inference drawn and imposes any rules of law that may drive the result. That inference still requires reversal if the underlying facts are not supported by substantial evidence or the logic of the inference is faulty, even where the agency acts within its expertise, or if the agency proceeds under an incorrect view of the law.

# II. Applicability of Indiana Administrative Code

[7] As an initial matter, we address the applicability of the portion of the Indiana Administrative Code ("IAC") relevant to disability discrimination in employment, which is dedicated to "implement[ing] IC 22-9-5 that requires equal employment opportunities for qualified individuals with disabilities." 910 IAC 3-1-1 (2013). Indiana Code section 22-9-5-27, which grants the ICRC the authority to adopt rules regarding employment discrimination against disabled people, states: "These rules must not be in conflict with the provisions of the federal rules adopted under the employment discrimination provisions of the federal Americans with Disabilities Act (42 U.S.C. 12101 et seq)." Ind. Code § 22-9-5-27.

[8] In their briefs, both parties cite to the IAC and the Code of Federal Regulations ("CFR"),[3] the corresponding federal administrative rules, interchangeably. However, the most recent CFR sections conflict with their IAC counterparts to an extent that renders the provisions of the IAC invalid. [4]

---

[3] The CFR is an "administrative interpretation of the [ADA] by the enforcing agency . . . [that,] while not controlling upon courts by reason of their authority, do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance." *Gile v. United Airlines, Inc.*, 95 F.3d 492, 497 (7th Cir. 1996), *reh'g and suggestion for reh'g en banc denied*. We therefore cite to the ADA and relevant portions of the CFR interchangeably, despite the fact they were most recently amended in different years.

[4] We find it unsettling that neither party recognized this difference between the current version of the CFR and the current version of the IAC, which do not comport. Further, Davis, who is represented by ICRC, cited the 2007 version of the CFR, which has been invalid for a decade. *See* Pub. L. No. 110-325, 122 Stat. 3553 (2008) (amending relevant sections of the CFR). In addition to this inexplicable error, Davis' brief is replete with citations that seem to be to the record, but do not indicate whether the material is from the

## A. Federal Regulations

Since its codification in 1990, the ADA has undergone several revisions, the most extensive being the ADA Amendments Act of 2008 ("ADAAA"). When Congress passed the ADAAA, it explicitly indicated it wished to abrogate two United States Supreme Court cases: *Sutton v. United Air Lines, Inc.*, 527 U.S. 471 (1999), and *Toyota Motor Manufacturing, Kentucky, Inc. v. Williams*, 534 U.S. 184 (2002).[5] Pub. L. No. 110-325(2) (2008). Congress acted because the Court had too narrowly interpreted the ADA, specifically regarding whether a condition substantially limits one or more of a person's major life activities. *Id*. Thus, the ADAAA was intended to broaden the definitions used to determine whether a person is disabled. *Id*.

First, the ADAAA changed the list of "major life activities" that could be affected by a person's condition. *Id*. In 2001, "major life activities" were "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(i)

---

appendices or transcripts. This failure to properly cite the record has greatly hindered our review of this very complex record.

[5] *Sutton* held, in relevant part:

> "A person whose physical or mental impairment is corrected by medication or other measures does not have an impairment that presently 'substantially limits' a major life activity. To be sure, a person whose physical or mental impairment is corrected by mitigating measures still has an impairment, but if the impairment is corrected it does not 'substantially limi[t]' a major life activity."

527 U.S. 482-3.

*Toyota* held, in relevant part, "to be substantially limited in performing manual tasks, an individual must have an impairment that prevents or severely restricts the individual from doing activities that are of central importance to most people's daily lives. The impairment's impact must also be permanent or long term." 534 U.S. at 198.

(2001). In 2012, the definition of "major life activities" was amended to include, but not limit the applicable activities to: "[c]aring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, sitting, reaching, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, interacting with others, and working." 29 C.F.R. § 1630.2(i)(1)(i) (2012).

[11] Second, the ADAAA amended the requirements for determining if a condition "substantially limits" a person's performance of a major life activity. Pub. L. No. 110-325(2) (2008). In 2001, the CFR provided:

> The following factors should be considered in determining whether an individual is substantially limited in a major life activity:
>
> (i) The nature and severity of the impairment;
>
> (ii) The duration or expected duration of the impairment; and
>
> (iii) The permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment.

29 C.F.R. § 1630.2(j)(2)(i)-(iii) (2001). But in 2012, that same section of the C.F.R. stated, in response to the ADAAA:

> (j) Substantially limits -
>
> > (1) Rules of construction. The following rules of construction apply when determining whether an

impairment substantially limits an individual in a major life activity:

> (i) The term "substantially limits" shall be construed broadly in favor of expansive coverage, to the maximum extent permitted by the terms of the ADA. "Substantially limits" is not meant to be a demanding standard.

> (ii) An impairment is a disability within the meaning of this section if it substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population. An impairment need not prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting. Nonetheless, not every impairment will constitute a disability within the meaning of this section.

> (iii) The primary object of attention in cases brought under the ADA should be whether covered entities have complied with their obligations and whether discrimination has occurred, not whether an individual's impairment substantially limits a major life activity. Accordingly, the threshold issue of whether an impairment "substantially limits" a major life activity should not demand extensive analysis.

> (iv) The determination of whether an impairment substantially limits a major life activity requires an individualized assessment. However, in making this assessment, the term "substantially limits" shall be interpreted and applied to require a degree of

functional limitation that is lower than the standard for "substantially limits" applied prior to the ADAAA.

(v) The comparison of an individual's performance of a major life activity to the performance of the same major life activity by most people in the general population usually will not require scientific, medical, or statistical analysis. Nothing in this paragraph is intended, however, to prohibit the presentation of scientific, medical, or statistical evidence to make such a comparison where appropriate.

(vi) The determination of whether an impairment substantially limits a major life activity shall be made without regard to the ameliorative effects of mitigating measures. However, the ameliorative effects of ordinary eyeglasses or contact lenses shall be considered in determining whether an impairment substantially limits a major life activity.

(vii) An impairment that is episodic or in remission is a disability if it would substantially limit a major life activity when active.

(viii) An impairment that substantially limits one major life activity need not substantially limit other major life activities in order to be considered a substantially limiting impairment.

(ix) The six-month "transitory" part of the "transitory and minor" exception to "regarded as" coverage in § 1630.15(f) does not apply to the definition of "disability" under paragraphs (g)(1)(i)

(the "actual disability" prong) or (g)(1)(ii) (the "record of" prong) of this section.  The effects of an impairment lasting or expected to last fewer than six months can be substantially limiting within the meaning of this section.

29 C.F.R. § 1630.2(j)(1)(i)-(ix) (2012).

## B. State Regulations

[12]  Two years after the ADA was enacted, Indiana enacted statutes addressing employment discrimination against disabled people.  P.L. 111-1992, Sec. 4 (1992).  The legislature granted authority to the ICRC to adopt rules regarding employment discrimination against disabled people but required: "These rules must not be in conflict with the provisions of the federal rules adopted under the employment discrimination provisions of the federal Americans with Disabilities Act (42 U.S.C. 12101 et seq)."  Ind. Code § 22-9-5-27.  The ICRC enacted the relevant portions of the IAC in 1998.  Since 1998, the ICRC has "readopted" these provisions in 2005, 2007, and 2013.

[13]  The latest version of the IAC defines a 'major life activity' as "a function, such as the following: (1) Caring for oneself. (2) Performing a manual task. (3) Walking. (4) Seeing. (5) Hearing. (6) Speaking. (7) Breathing. (8) Learning. (9) Working."  910 IAC § 3-2-9 (2013).  This language tracks the 2001 version of 29 C.F.R. § 1630.2(i).  *See supra* ¶ 9.  The latest IAC provision regarding 'substantial limitation' provides:

The following factors should be considered in determining whether an individual is substantially limited in a major life activity:

> (1) The nature and severity of the impairment.

> (2) The duration or expected duration of the impairment.

> (3) The permanent or long term impact, or the expected permanent or long term impact, of or resulting from the impairment.

910 IAC § 3-2-15(b) (2013). This language tracks the 2001 version of 29 C.F.R. § 1630.2(j)(2)(i)-(iii). *See supra* ¶ 10.

[14] As can be seen from comparison of the federal and state regulations quoted herein, the definitions for determining disability under the IAC have not been modified to account for the changes produced by enactment of the ADAAA. The state regulations are outdated and narrower than the federal regulations. Because Indiana Code section 22-9-5-27 requires the portions of the IAC dealing with employment discrimination against disabled people not conflict with the ADA, the current version of the IAC is invalid and we cannot rely on it. *See, e.g., Maraman v. City of Carmel*, 47 N.E.3d 1218, 1224 (Ind. 2015) (invalidating local ordinance enacted in violation of authority granted to municipality by statute), *trans. denied.* Thus, our review is limited to the provisions of federal law.

## III. *Prima Facie* Case of Disability Discrimination

The ADA states: "No covered entity shall discriminate against a qualified individual on the basis of disability in regard to . . . discharge of employees[.]" 42 U.S.C.A. § 12112 (2009). KCARC argues the ICRC's conclusion that KCARC engaged in an unlawful discriminatory practice was not supported by substantial evidence and was contrary to applicable law because Davis did not establish a *prima facie* case of disability discrimination. To establish a *prima facie* case of disability discrimination in employment, a plaintiff must prove (1) she is disabled within the meaning of the ADA; (2) her work performance met the employer's legitimate expectations; (3) she was discharged; and (4) "the circumstances surrounding the discharge indicate it is more likely than not that [her] disability was the reason for the discharge." *Powdertech, Inc. v. Joganic*, 776 N.E.2d 1251, 1256 (Ind. Ct. App. 2002).

### A. *Disabled Within the Meaning of the ADA*

Pursuant to the ADA, a person has a disability if that person has "a physical or mental impairment that substantially limits one or more major life activities of such individual[.]" 42 U.S.C.A. § 12102(1) (2009).[6] Under the ADA, the

---

[6] The full definition of "disability," as codified in the ADA, is: "The term "disability" means, with respect to an individual -- (A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such impairment; or (C) being regarded as having such an impairment." 42 U.S.C.A. § 12102(1) (2009) (reference to other parts of the statute omitted). However, because the statute is written in the disjunctive and we conclude Davis is disabled as defined by the first prong, we need not consider the other two prongs of the definition. *See In re L.S.*, 717 N.E.2d 204, 208 (Ind. Ct. App. 1999) (statute written in disjunctive requires proof of only one of the prongs*), reh'g denied, trans. denied, cert. denied* 534 U.S. 1161 (2002).

definition of "major life activities" was amended to include, but not limit the applicable activities to: "[c]aring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, sitting, reaching, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, interacting with others, and working." 29 C.F.R. § 1630.2(i)(1)(i) (2012).

The ADA further provides:

> The definition of "disability" in paragraph (1) shall be construed in accordance with the following:
>
> > (A) The definition of disability in this chapter shall be construed in favor of broad coverage of individuals under this chapter, to the maximum extent permitted by the terms of this chapter.
> >
> > (B) The term "substantially limits" shall be interpreted consistently with the findings and purposes of the ADA Amendments Act of 2008.
> >
> > (C) An impairment that substantially limits one major life activity need not limit other major life activities in order to be considered a disability.
> >
> > (D) An impairment that is episodic or in remission is a disability if it would substantially limit a major life activity when active.

42 U.S.C.A. § 12102(4) (2009).

Regarding Davis' disability, the ICRC found:

11. Davis had a syncopal episode, or lost consciousness, on August 26, 2012. This episode required Davis to be seen at the hospital. While Davis returned to work the next day, Davis sought follow-up treatment by a physician. This single incident led to Davis being on work restrictions imposed by Dr. Nibel. While the duration or expected duration of the impairment was unknown, the nature and severity of the impairment was minimum. Davis was allowed to return to work with lifting and movement restrictions.

(App. Vol. II at 10.) Based thereon, the ICRC concluded, "Davis proved she meets the definition of 'disabled' under the law and therefore [is] a member of a protected class." (*Id*. at 9.) KCARC challenges that finding and conclusion, arguing there "is nothing in the record that would support a finding that Davis's single loss of consciousness incident has substantially limited her major life activities and Davis never asserted that it did." (Br. of Appellant at 24.) We disagree as the record reflects Davis' condition substantially limited one or more of her major life activities.

[19] In response to KCARC's request for clarification of the light duty restrictions, Dr. Nibel wrote a letter explaining:

> [Davis] is currently suffering from a medical condition that is causing some dizziness and headaches. The dizziness appears to be positional in nature. Therefore, part of her restrictions would include minimizing any kind of bending, stooping, rapid or repetitive rotational movements (such as turning from side to side), etc. Similarly she should not lift anything greater than 10 pounds or so, predominantly because such lifting could require positional changes that could exacerbate her dizziness and/or headache. [Davis] is taking medications to help her with her

condition that have as a side effect fatigue. As a result, she should not do anything that requires a lot of energy expenditure, such as walking long distances, using stair cases, etc. Also, [Davis] suffered from a syncopal episode (essentially a loss of consciousness), so it would definitely be to her benefit to have a job that consists mostly of sitting.

(*Id*. at 43.) Therefore, based on the fact Dr. Nibel's restrictions included walking, standing, lifting, and bending, we conclude the ICRC did not err when it determined at least one of Davis' major life activities was affected by her condition. *See* 29 C.F.R. § 1630.2(i)(1)(i) (2012) (non-exhaustive list of "major life activities" as defined by the ADA, including walking, standing, lifting, and bending).

[20] As we conclude Davis' condition affected one or more major life activities, we now examine whether those major life activities are "substantially limit[ed]" by her condition. *See* 42 U.S.C.A. § 12102(1) (a person has a disability if that person has "a physical or mental impairment that substantially limits one or more major life activities of such individual").

[21] KCARC likens the facts here to those in *Couts v. Beaulieu Group, LLC*, 288 F. Supp. 2d 1292 (N.D. Georgia 2003), in which the District Court held "simply having an impairment or condition . . . is not sufficient to satisfy the ADA's requirements [to consider a person disabled under the ADA]." *Id*. at 1303 (citing *Toyota*, 534 U.S. at 195). "Instead, the impairment must substantially limit one or more of Plaintiff's major life activities." *Id*. (citing *Toyota*, 534 U.S. at 195). In *Couts*, the court held Couts was not disabled under the ADA

because he had not presented evidence he was substantially limited from performing any major life activities.

[22] However, *Couts* relied on *Toyota*, which was explicitly abrogated by the ADAAA, which states in relevant part:

SEC. 2. FINDINGS AND PURPOSES.

(a) FINDINGS. - Congress finds that -

(1) in enacting the Americans with Disabilities Act of 1990 (ADA), Congress intended that the Act "provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities" and provide broad coverage;

(2) in enacting the ADA, Congress recognized that physical and mental disabilities in no way diminish a person's right to fully participate in all aspects of society, but that people with physical or mental disabilities are frequently precluded from doing so because of prejudice, antiquated attitudes, or the failure to remove societal and institutional barriers;

(3) while Congress expected that the definition of disability under the ADA would be interpreted consistently with how courts had applied the definition of a handicapped individual under the Rehabilitation Act of 1973, that expectation has not been fulfilled;

(4) the holdings of the Supreme Court in *Sutton v. United Air Lines, Inc.*, 527 U.S. 471 (1999) and its companion cases have narrowed the broad scope of protection

intended to be afforded by the ADA, thus eliminating protection for many individuals whom Congress intended to protect;

(5) the holding of the Supreme Court in *Toyota Motor Manufacturing, Kentucky, Inc. v. Williams*, 534 U.S. 184 (2002) further narrowed the broad scope of protection intended to be afforded by the ADA;

(6) as a result of these Supreme Court cases, lower courts have incorrectly found in individual cases that people with a range of substantially limiting impairments are not people with disabilities;

(7) in particular, the Supreme Court, in the case of *Toyota Motor Manufacturing, Kentucky, Inc. v. Williams*, 534 U.S. 184 (2002), interpreted the term "substantially limits" to require a greater degree of limitation than was intended by Congress; and

(8) Congress finds that the current Equal Employment Opportunity Commission ADA regulations defining the term "substantially limits" as "significantly restricted" are inconsistent with congressional intent, by expressing too high a standard.

(b) PURPOSES.—The purposes of this Act are—

(1) to carry out the ADA's objectives of providing "a clear and comprehensive national mandate for the elimination of discrimination" and "clear, strong, consistent, enforceable standards addressing discrimination" by reinstating a broad scope of protection to be available under the ADA;

(2) to reject the requirement enunciated by the Supreme Court in *Sutton v. United Air Lines, Inc.*, 527 U.S. 471 (1999) and its companion cases that whether an impairment substantially limits a major life activity is to be determined with reference to the ameliorative effects of mitigating measures;

(3) to reject the Supreme Court's reasoning in *Sutton v. United Air Lines, Inc.*, 527 U.S. 471 (1999) with regard to coverage under the third prong of the definition of disability and to reinstate the reasoning of the Supreme Court in *School Board of Nassau County v. Arline*, 480 U.S. 273 (1987) which set forth a broad view of the third prong of the definition of handicap under the Rehabilitation Act of 1973;

(4) to reject the standards enunciated by the Supreme Court in *Toyota Motor Manufacturing, Kentucky, Inc. v. Williams*, 534 U.S. 184 (2002), that the terms "substantially" and "major" in the definition of disability under the ADA "need to be interpreted strictly to create a demanding standard for qualifying as disabled," and that to be substantially limited in performing a major life activity under the ADA "an individual must have an impairment that prevents or severely restricts the individual from doing activities that are of central importance to most people's daily lives";

(5) to convey congressional intent that the standard created by the Supreme Court in the case of *Toyota Motor Manufacturing, Kentucky, Inc. v. Williams*, 534 U.S. 184 (2002) for "substantially limits", and applied by lower courts in numerous decisions, has created an inappropriately high level of limitation necessary to obtain coverage under the ADA, to convey that it is the intent of

Congress that the primary object of attention in cases brought under the ADA should be whether entities covered under the ADA have complied with their obligations, and to convey that the question of whether an individual's impairment is a disability under the ADA should not demand extensive analysis; and

(6) to express Congress' expectation that the Equal Employment Opportunity Commission will revise that portion of its current regulations that defines the term "substantially limits" as "significantly restricted" to be consistent with this Act, including the amendments made by this Act.

Pub. L. No. 110-325, 122 Stat. 3553 (2008). As indicated in the notes to the ADAAA, *Toyota* was overruled because its holding was too restrictive regarding the meaning of "substantially limits" within the ADA requirements. *Id*.

Additionally, the *Toyota* Court relied on the 2001 version of 29 C.F.R. § 1630.2(j)(2)(ii)-(iii) (2001) to support its interpretation "substantially limits." Since then, in accordance with the ADAAA, that section has been amended to broaden the scope of protection under the ADA. *See supra* ¶ 10. Because *Couts* relied on *Toyota*, which was abrogated by the ADAAA and decided under a different set of definitions, we decline to rely on *Couts* as we decide whether Davis' disability was substantially limiting.

Turning to the facts in this case, KCARC argues Davis is not substantially limited in her major life activities because:

> The undisputed facts are that Davis never experienced a "syncopal" incident before or after August 26, 2012, and never suffered any long term effects from it. Rather, the evidence shows that she experienced "some dizziness and headaches" that resolved within three weeks of the incident prompting her treating physician to determine that she could return to work without restrictions.

(Br. of Appellant at 24.) KCARC is incorrect, as it seems to rely on an outdated version of the ADA and corresponding CFR provisions.

[25] We have already concluded Davis' condition affected a major life activity, that is walking, standing, lifting, and bending. There is no time threshold to overcome for a restriction to substantially limit a major life activity. 29 C.F.R. § 1630.2(j)(1)(ix). As the ADAAA requires the term substantially limit to be "construed broadly in favor of expansive coverage," 29 C.F.R. § 1630.2(j)(1)(i), we conclude the ICRC did not err when it determined Davis had a disability under the ADA. *See Atwell v. Indianapolis-Marion Cty. Forensic Servs. Agency*, 168 F.Supp.3d 1125, 1136 (S.D. Ind. 2016) (reasonable jury could conclude employee with post-concussive syndrome was disabled under the ADA because employee provided evidence, including letter from her doctor, that her condition limited her performance of major life activities such as "short-term memory, speaking, concentrating, and thinking"). *See also Heatherly v. Portillo's Hot Dogs, Inc.*, 958 F.Supp.2d 913, 920 (N.D. Ill. 2013) (declining to accept Portillo's argument that the short duration of Heatherly's work restrictions prevents her from being disabled under the ADAAA).

### B. "Qualified Individual"

The ADA defines "qualified individual" as "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C.A. § 12111(8) (2009). "[C]onsideration shall be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job." *Id.* The CFR gives additional, more specific criteria:

> Essential functions -
>
> (1) In general. The term essential functions means the fundamental job duties of the employment position the individual with a disability holds or desires. The term "essential functions" does not include the marginal functions of the position.
>
> (2) A job function may be considered essential for any of several reasons, including but not limited to the following:
>
>> (i) The function may be essential because the reason the position exists is to perform that function;
>>
>> (ii) The function may be essential because of the limited number of employees available among whom the performance of that job function can be distributed; and/or

(iii) The function may be highly specialized so that the incumbent in the position is hired for his or her expertise or ability to perform the particular function.

(3) Evidence of whether a particular function is essential includes, but is not limited to:

(i) The employer's judgment as to which functions are essential;

(ii) Written job descriptions prepared before advertising or interviewing applicants for the job;

(iii) The amount of time spent on the job performing the function;

(iv) The consequences of not requiring the incumbent to perform the function;

(v) The terms of a collective bargaining agreement;

(vi) The work experience of past incumbents in the job; and/or

(vii) The current work experience of incumbents in similar jobs.

29 C.F.R. § 1630.2(n) (2012).

[27]    The ICRC found: "KCARC had no issues with Ms. Davis' work performance until August 26, 2012, [when Davis experienced a syncopal episode]." (App.

Vol. II at 5.)  Regarding whether Davis could perform the essential functions of

her job without reasonable accommodation, the ICRC found and concluded:

> The ALJ concludes Davis could have performed the essential
> functions of the job of cooking, cleaning, grocery shopping, and
> providing day-to-day assistance to residents even in her
> condition.  KCARC points out that Davis would not be able to
> run after individuals who are "flight risks" or protect herself from
> residents who may be physically aggressive.  While the ALJ
> agrees with this point, the same would be true for an individual
> without a disability if the DSP are slower or weaker than the
> residents.  Further, chasing after residents or defending oneself
> from aggressive residents were not "essential functions" of the
> job.  Davis presented no evidence to answer the question on how
> she would perform the duties as a DSP with the restrictions.  If
> Davis was to remain in the house, her ability to assist another
> DSP with a resident would be limited.  Further, Davis' inability
> to move quickly in times of emergencies would be restricted as
> well.

(*Id*. at 11-12.)  In addition, it is likely Dr. Nibel's restrictions on Davis' ability to

work prevented her from performing some of the duties listed on the job

description without reasonable accommodations.  For example, some of the

duties listed on the job description for a DSP are "house cleaning duties," (*id*. at

35); "[a]ssist with lifting, turning, moving, positioning, and transporting

consumers into and out of beds, chairs, bathtubs, wheelchairs, lifts, etc. (as

needed)," (*id*.); "[a]ssist consumers with operation, usage, and maintenance of

adaptive devices," (*id*.); and "lift 75 pounds independently and over 75 pounds

with assistance."  (*Id*.)  These duties would have been affected by Davis'

restrictions from Dr. Nibel, which included: "minimizing any kind of bending,

stooping, rapid or repetitive rotational movements . . . not lift[ing] anything greater than 10 pounds or so . . . and not do[ing] anything that requires a lot of energy expenditure, such as walking long distances, using staircases[.]" (*Id.* at 43.)

[28] Neither party presented evidence regarding whether Davis could perform the essential functions of her job with reasonable accommodations, because KCARC did not investigate possible accommodations. The ICRC found, "KCARC did not attempt to see what alternatives were available in Group Home 11. KCARC could assign a third DSP to the house to assist in areas Davis could not perform as it did with [two other KCARC employees] who could not administer medication." (*Id.* at 12.)

[29] The United States Supreme Court explained the interaction between the requirement a person be a "qualified individual" with a disability and the employer's duty to seek a reasonable accommodation:

> First, the ADA says that an employer may not "discriminate against a qualified individual with a disability." 42 U.S.C. § 12112(a). Second, the ADA says that a "qualified" individual includes "an individual with a disability who, *with or without reasonable accommodation*, can perform the essential functions of" the relevant "employment position." § 12111(8) (emphasis added). Third, the ADA says that "discrimination" includes an employer's "*not making reasonable accommodations* to the known physical or mental limitations of an otherwise qualified . . . employee, *unless* [the employer] can demonstrate that the accommodation would impose an *undue hardship* on the operation of [its] business." § 12112(b)(5)(A) (emphasis added).

*U.S. Airways v. Barnett*, 535 U.S. 391, 386 (2002) (emphasis in original). Thus, we must turn to whether KCARC discriminated against Davis when it did not offer her a reasonable accommodation in an effort to determine if she could perform the essential functions of her job with a reasonable accommodation following her syncopal episode and Dr. Nibel's restrictions.

[30] The Seventh Circuit Court of Appeals explained in *Brown v. Milwaukee Board of School Directors*, 855 F.3d 818, 821 (7th Cir. 2017):

> Identifying reasonable accommodations for a disabled employee requires both employer and employee to engage in a flexible, interactive process. Both parties are responsible for that process. If a reasonable accommodation was available but the employer prevented its identification by failing to engage in the interactive process, that failure is actionable. On the other hand, if the employee "does not provide sufficient information to the employer to determine the necessary accommodations, the employer cannot be held liable for failing to accommodate the disabled employee."

(internal citations omitted). Further:

> The legislative history makes clear that employers are required to engage in an interactive process with employees in order to identify and implement appropriate reasonable accommodations. The Senate Report explained that: "A problem-solving approach should be used to identify the particular tasks or aspects of the work environment that limit performance and to identify possible accommodations . . . employers first will consult with and involve the individual with a disability in deciding on the appropriate accommodation." S.Rep. No. 101-116, at 34 (1989); *see also* H.R. Rep. No. 101-485, pt. 2, at 65 (1990), U.S. Code Cong. & Admin. News at 303, 348.

*Barnett v. U.S. Air, Inc*. 228 F.3d 1105, 1111 (9th Cir. 2000), *overturned on other grounds by U.S. Airways, Inc. v. Barnett*, 535 U.S. 391 (2002).

[31] The CFR directs:

> To determine the appropriate reasonable accommodation it may be necessary for the covered entity to initiate an informal, interactive process with the qualified individual with a disability in need of the accommodation. This process should identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations.

29 C.F.R. § 1630.2(o)(3). "Failing to discuss a reasonable accommodation in a meeting in which the employer takes an adverse employment action against an injured employee may demonstrate a lack of good faith." *Rorrer v. City of Stow*, 743 F.3d 1025, 1040 (6th Cir. 2014). Based on the legislative history and case law, we conclude this interactive process is mandatory. *See Klieber v. Honda of America Mfg., Inc.*, 485 F.3d 862, 871 (6th Cir. 2007) ("Even though the interactive process is not described in the [ADA] statute's text, the interactive process is mandatory, and both parties have a duty to participate in good faith."). "Failure to engage in this 'interactive process' cannot give rise to a claim for relief, however, if the employer can show that no reasonable accommodation was possible." *Hansen v. Henderson*, 233 F.3d 521, 523 (7th Cir. 2000).

[32] Here, KCARC's policy indicated,

> If for any reason you are (or become) unable to perform all or part of the essential functions of the job (for example lifting), it is your obligation to inform the Human Resources Department immediately.
>
> Failure to do so could result in disciplinary action up to and/or including termination.
>
> Human Resources will engage in the Good Faith Interactive process in the hope that an effective accommodation can be identified. The process cannot guarantee that an effective accommodation will be identified. However, by participation in this process we can be assured that all alternatives have been fairly considered.

(App. Vol. II at 37.) Human Resources Supervisor Amy O'Dell testified when "staff were to come to me and say they cannot complete functions of their job, [she] would pull [out a reasonable accommodations worksheet] and go talk to [her] supervisor." (Tr. Vol. II at 22.) However, when Davis approached KCARC with the information regarding her work restrictions as ordered by Dr. Nibel, O'Dell conferred with KCARC Vice President Jeff Darling instead of beginning an investigation into possible reasonable accommodations. O'Dell told Darling that Davis did not have any paid time off and was not eligible for FMLA leave because she had not worked for KCARC for very long. O'Dell and Darling "looked at the doctor's notes, and [they] determined there's no accommodation." (*Id.* at 16.) O'Dell testified she also did not know how long Davis' restrictions would last. O'Dell and Darling decided to terminate Davis, based on the fact she did not have any available leave and Dr. Nibel's

restrictions made her unable to perform the essential functions of her job without reasonable accommodations. When terminating Davis, O'Dell encouraged Davis to reapply for a position with KCARC when Dr. Nibel lifted her work restrictions.

[33] When asked why she did not complete a reasonable accommodation worksheet, O'Dell testified "it was obvious from the doctor's note that there was no accommodation," (*id.*), and her analysis would not have changed had she filled out the worksheet. She claimed completion of the worksheet "was not necessary." (*Id.*) O'Dell also testified she did not complete the worksheet because Davis did not ask for an accommodation. However, the submission of Dr. Nibel's note was sufficient to put O'Dell and KCARC on notice that Davis was requesting a reasonable accommodation. *See Ekstrand v. School District of Somerset*, 583 F.3d 972, 976 (7th Cir. 2009) ("cases have consistently held that disabled employees must make their employers aware of any nonobvious, medically necessary accommodations with corroborating evidence such as a doctor's note . . . before an employer may be required under the ADA's reasonableness standard" to provide an accommodation.") *See also Gile v. United Airlines, Inc.*, 213 F.3d 365, 373 (7th Cir. 2000) (holding employer did not engage in interactive process when it refused shift transfer based on a doctor's note recommending a shift transfer to ameliorate Gile's depression and other psychological disorders and enable Gile to perform the essential functions of her job), *reh'g and suggestion for reh'g en banc denied*.

[34] Although KCARC did not engage in the interactive process of determining whether a reasonable accommodation was available, it still can defeat Davis' claim if it demonstrated no reasonable accommodation was possible. The ICRC found: "KCARC could assign a third DSP to the house to assist in areas Davis could not perform as it did with [other allegedly similarly situated employees]." (App. Vol. II at 12.) Based on this unchallenged finding, KCARC could have implemented a reasonable accommodation. *See Madlem v. Arko*, 592 N.E.2d 686, 687 (Ind. 1992) ("Because Madlem does not challenge the findings of the trial court, they must be accepted as correct."). Thus, KCARC failed to meet its burden to demonstrate no reasonable accommodation was available.

[35] In summary, Davis was a qualified individual with a disability. Prior to her syncopal episode, she was able to perform the essential functions of her job without reasonable accommodation. After her syncopal episode, she was restricted from performing some of the essential functions of her job, triggering KCARC's duty to engage in an interactive process with Davis to determine if she could perform the duties of her job with reasonable accommodation. KCARC did not engage in this process, and instead terminated Davis. Contrary to O'Dell's allegation, such accommodation was possible, as shown by the ICRC's uncontested finding. Thus, we conclude KCARC discriminated against Davis based on her disability when it fired her instead of attempting to determine if there was a reasonable accommodation available. *See, e.g., E.E.O.C. v. Sears, Roebuck & Co.*, 417 F.3d 789, 807 (7th Cir. 2005) (genuine

issue of material fact existed regarding the interactive process between employer and employee to determine a reasonable accommodation was feasible when evidence a reasonable accommodation was available was presented).[7]

# II. Damages

## *A. Backpay*

[36] The Seventh Circuit Court of Appeals recently explained, a plaintiff "who wins a favorable verdict on an ADA claim is presumptively entitled to backpay." *Stragapede v. City of Evanston, Illinois*, 865 F.3d 861, 868 (7th Cir. 2017).[8] The plaintiff must submit evidence to support her calculation of backpay and the burden then "shifts to the defendant to show that the [employee] failed to mitigate damages or that damages were in fact less than [she] asserts." *Id*. To prove a failure to mitigate in this context, the employer must show that "(1) the [employee] failed to exercise reasonable diligence to mitigate his damages, and [that] (2) there was a reasonable likelihood that the [employee] might have found comparable work by exercising reasonable diligence." *Id*. (quoting

---

[7] The parties' arguments focus on the first two prongs of the *Powdertech* test to establish a *prima facie* case of disability discrimination in employment: whether Davis is disabled within the meaning of the ADA and whether she is qualified to complete the essential functions of her position. *See Powdertech*, 776 N.E.2d at 1256 (listing first two prongs of *prima facie* test). Regarding the other two prongs, it is undisputed KCARC terminated Davis' employment after learning of certain restrictions Dr. Nibel placed on her ability to work and concluding, without investigation, that KCARC could not accommodate Davis' restrictions stemming from her disability. (*See* App. Vol. II at 6 (ICRC's findings regarding the actions surrounding Davis' termination).)

[8] Similarly, Indiana Code section 22-9-1-6(j) authorizes the ICRC to order damages "to restore complainant's losses incurred as a result of discriminatory treatment, as the commission may deem necessary to assure justice; however, except in discriminatory practices involving veterans, this specific provision when applied to orders pertaining to employment shall include only wages, salary, or commissions[.]"

*Fleming v. County of Kane*, 898 F.2d 553, 560 (7th Cir. 1990) (emphases omitted)).

[37] The ICRC awarded Davis $25,837.37 in lost wages. KCARC argues this amount is incorrect because Davis did not mitigate her damages. Specifically, KCARC asserts:

> Although Davis was unable to secure employment at the rate of pay she received at KCARC for almost two years, it was due to her own actions. Furthermore, Davis secured three other positions of comparable employment following her termination from KCARC that should have cut off her back pay award. Davis's inability to maintain comparable employment was the result of her own failures and the back pay award should not subsidize her time between jobs as her subsequent unemployment was not the result of KCARC's actions.

(Br. of Appellant at 45.) KCARC contends if Davis is entitled to any damages for backpay, the amount should reflect her pay between the day she was terminated, September 7, 2012, and the day she was released to go back to work, September 18, 2012. KCARC argues it invited Davis to reapply to her position when her work restrictions were lifted, and thus when she chose not to reapply, she ceased mitigating her damages. KCARC claims this would result in a damage award of "approximately 2 weeks of missed wages, or $704.15." (*Id.*)

[38] Regarding the calculation of Davis' backpay, the ICRC found:

16. At the time of termination, Davis earned $9.50 per hour and worked approximately forty (40) hours per week. Davis' average gross pay was $704.51 bi-weekly ($352.26 weekly).

17. Following Davis' termination, Davis worked at the following companies and earned wages accordingly:

    a. Bridges of Indiana (October 18, 2012 through April 2, 2013)               $4,013.26

    b. Eastgate (May 17, 2013 through August 15, 2013)               $3,028.86

    c. Hillside Manor (September 19, 2013 through November 21, 2013)               $1,994.25

Davis earned a total of $9,036.37.

18. Davis began employment at Lewis Bakery on July 31, 2014 and is currently employed. She earns a salary greater than what she earned at KCARC.

19. KCARC terminated Davis on September 7, 2012. Davis obtained employment that provided a greater salary starting on July 31, 2014. There is [sic] a total of 99 weeks between the date of termination and the date of substantial employment. Davis would have earned $34,873.74 had she remained employed at KCARC. Factoring in Davis' interim earnings, Davis' potential loss of earnings are [sic] $25,837.37.

(App. Vol. II at 8.) We agree with KCARC that this calculation of lost wages is excessive.

[39]     As is required, Davis presented evidence of her efforts to mitigate damages related to backpay from KCARC. However, in its rebuttal of Davis' contentions, KCARC highlighted the reasons it took Davis almost two years to obtain employment comparable to her position at KCARC. Davis testified at the ALJ hearing that she worked at "Bridges of Indiana[,]" (Tr. Vol. I at 86), which is "almost the same as KCARC[.]" (*Id.*) She testified she was terminated based on what she referred to as a false accusation that she "took a resident to a bar." (*Id.* at 87.) However, the disciplinary report from Bridges stated, regarding the incident with the C.H., a resident in Davis' care:

> BOI was notified on 04/02/2013 at 6:00pm of the following incident. Melissa [sic] Davis, Bridges of Indiana staff was reported present during the Incident. On 4/2/2013 Assistant Director, Stacy Lee, received a phone call from [W.B.]. [W.B.] reported that her daughter, [C.H.], told her that on that [sic] way to Friend's Group on Monday (4/1/2013), that staff went by a bar and left [C.H.] outside in the car. [C.H.] reported that staff went inside to check on her husband. [C.H.] then reported that staff came out with her husband and they were hugging and kissing and the husband offered Cindy a beer. At that time [C.H.] and staff left and went to [F]riend's [G]roup. During the investigation and interviews, [C.H.] identified the same event as she described to her Mother, [W.B.]. [C.H.] is very upset about the situation. Staff, Melissa [sic] Davis, denied the account of the incident and wrote a statement including the activities that she claims occurred on the date of the alleged event. It has been determined that although we can not [sic] substantiate due to lack of supporting evidence, Bridges of Indiana will be dismissing Melissa [sic] Davis as an employee. This decision was made as an effort to protect the consumer from any and all instances of alleged abuse, neglect and exploitation.

(App. Vol. II at 75.)

[40] Davis then worked at Hillside Manor and Eastgate Manor caring for elderly residents. Davis testified she had to lift patients at both Hillside and Eastgate, and she left both places of employment because her doctor "was trying to figure out what heart medication to put her on . . . [because the medicine] had lowered [her] blood pressure . . . too low, to where [her] lifting was – could have ended badly as far as, you know, dropping a patient." (Tr. Vol. I at 92.) However, a Disciplinary Action Report from Eastgate indicated Davis failed "to immediately report to supervisor an incident of abuse neglect misconduct." (App. Vol. II at 72) (errors in original). Additionally, the "Employee Counseling Form," (*id*. at 78), from Hillside indicated:

> [Davis] has been counceled of her attendance on Oct 11th after NO call NO show was warned of her attendance. On this day 11/21/13, [Davis] came in to her shirt after 2 pm stated her "B/P was dropping." B/P was taken by nurse on duty 107/84. Informed [Davis] she needed to try to finish her shift to not leave staff short. [Davis] walked out of building to not return. Leaving staff on shift.

(*Id*.) (errors in original).

[41] We conclude KCARC cannot be held responsible for backpay when Davis obtained positions comparable to her position at KCARC, then was terminated from those positions for her behavior. To the extent she mitigated her damages, we determine that mitigation ended the day she was fired from Bridges. Therefore, the calculation of damages is as follows: for the time between

September 7, 2012, when KCARC terminated Davis and October 18, 2012, the date she was hired at Bridges, Davis would have made $2,113.56.[9] Between October 18, 2012, and April 3, 2013, Davis was employed by Bridges for $9.00 for ten to thirty hours per week. For that period of time, her earnings were $4,013.26. For the same period of time, Davis could have earned $8,101.98[10] at KCARC, for a difference of $4,088.72. Based thereon, we reduce Davis' backpay damages to $6,202.28 to reflect the time she exercised reasonable diligence in finding employment comparable to the job she had at KCARC.

### B. Prejudgment Interest

[42] The ICRC awarded Davis prejudgment interest of $9,314.09, concluding:

> Interest is calculated at the statutory rate of eight percent compounded annually. Pre-judgment interest is calculated from the date of termination, *Woods v. Von Maur, Inc.*, No 09 C 7800, 2012 WL 2062400, at *7 (N.D.Ill. June 7, 2012), and ends when "damages have been ascertained in a meaningful way." *S.E.C. v. Koenig*, No. 02 C 2180, 2009 WL 4043319, at *4 (N.D.Ill. Nov. 23, 2009) (citing *Kaiser Aluminum & Chemical Corp v. Bonjorno*, 494 U.S. 827, 836, 110 S.Ct. 1570, 108 L.Ed.2d 842 (1990)). The ICRC finds that damages in this matter had not been ascertained in a meaningful way until the filing of the Proposed Findings of Fact, Conclusion of Law, and Order by previously appointed ALJ Noell F. Allen. The pre-judgment interest calculation will

---

[9] $352.26 x 6 weeks = $2,113.56.

[10] $352.26 x 23 weeks = $8,101.98.

therefore cover the period from Complainant's termination until April 13, 2016 for a total of $9,314.09.

(App. Vol. II at 12-13.)[11]  As the United States District Court of the Northern District of Indiana explained:

> Pre-judgment interest is "presumptively available to victims of federal law violations." *McKnight v. General Motors Corp.*, 973 F.2d 1366, 1372 (7th Cir. 1992); *see also Hutchison v. Amateur Electronic Supply, Inc.*, 42 F.3d 1037, 1047 (7th Cir. 1994).  Pre-judgment interest on back pay awards compensates a plaintiff for the loss of the use of the money.  *Downes v. Volkswagen of America, Inc.*, 41 F.3d 1132, 1144 (7th Cir.1994); *see also Partington v. Broyhill Furniture Industries, Inc.*, 999 F.2d 269, 274 (7th Cir. 1993) ("Money has a time value, and prejudgment interest is therefore necessary in the ordinary case to compensate a plaintiff fully for a loss suffered at time t and not compensated until t + 1, 2, 3 ... n.").

*Wilson v. AM General Corp.*, 979 F.Supp. 800, 802 (N.D. Ind. 1997).

[43] It is within the trial court's discretion, here the ICRC's discretion, to determine the interest rate to be used to determine the appropriate amount of prejudgment interest.  *Ward v. Tipton County Sheriff Dept.*, 937 F.Supp. 791, 800 (S.D. Ind. 1996).  However, we note "[o]ther district courts in the Seventh Circuit have

---

[11] While we agree that prejudgment interest was appropriate in this case, we remind the ICRC that the citation of unpublished opinions as precedent is generally discouraged. *See Kuehne v. United Parcel Service*, Inc. 868 N.E.2d 870, 874 (Ind. Ct. App. 2007) ("unpublished decisions issued by federal district courts do not constitute binding precedent upon this court.").  "However, unpublished cases may be deemed worthy of mentioning when a similar issue is presented to us and there is a dearth of other authority on point." Id. There is abundant published authority from the Indiana District Courts and the Seventh Circuit Court of Appeals on this issue, and thus that shortfall in available case law does not exist here.

used the federal post-judgment interest rate." *Id*. The federal post-judgment interest rate is found at 28 U.S.C.A. § 1961, which states in relevant part, "Such interest shall be calculated from the date of the entry of the judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding. [sic] the date of the judgment." Because prejudgment interest is a way by which an employee who was wrongly terminated can regain the value of his or her money, the ICRC was correct on the time frame for the calculation of prejudgment interest, which was from the date of Davis' termination, September 7, 2012, to the date ALJ Allen issued her order on April 13, 2016. *See Wilson*, 979 F.Supp. at 802 ("Pre-judgment interest on back pay awards compensates a plaintiff for the loss of the use of the money.").

[44]  Based thereon, we remand for calculation of prejudgment interest on the amended backpay amount of $6,202.28. We encourage the ICRC to plainly state its method for calculating the amount of interest ordered and the legal basis for such calculation method.

# Conclusion

[45]  As an initial matter we conclude the portions of the IAC that do not comport with the language of the ADA and the CFR are invalid. Regarding the facts of this case in light of the relevant federal statutes, we conclude Davis had a disability because one or more of her major life activities was substantially limited. Therefore, KCARC violated the ADA when it did not engage in the

interactive process of determining if there existed a reasonable accommodation to allow Davis to perform the essential functions of her position subject to Dr. Nibel's restrictions. However, the ICRC erred in its calculation of damages because Davis ceased to mitigate her damages when she was terminated from Bridges. Finally, prejudgment interest was appropriate.

[46] Accordingly, we affirm the ICRC's determination that Davis was disabled and KCARC unlawfully discriminated against her when it terminated her employment. However, we reverse the ICRC's damage award and reduce Davis' backpay damages to $6,202.28 to reflect the time she exercised reasonable diligence in finding employment comparable to the job she had at KCARC. We remand for the calculation of prejudgment interest on $6,202.28 in accordance with this opinion.

[47] Affirmed in part, reversed in part, and remanded.

Baker, J., and Altice, J., concur.